[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 25, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-10673

_____

D. C. Docket No. 00-00436-CR-J-25-TJC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KARL T. WALDON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 25, 2004)**

Before TJOFLAT, RONEY and FAY Circuit Judges.

PER CURIAM:

Defendant Karl Waldon, a former law enforcement officer for the Jacksonville Sheriff's Office, appeals his conviction for his involvement in a crime spree that culminated in the robbery and murder of convenience store owner Sami Safar. Waldon asks for reversal of his conviction based upon perceived grand jury irregularities, and also submits that reversible error occurred when the trial judge failed to suppress his own grand jury testimony and when the court death qualified the jury. Finally, Waldon claims that when the jury, at sentencing, failed to recommend either death or life imprisonment, the language of the Federal Death Penalty Act ("FDPA") precluded the trial judge from giving him a life sentence. We reject each of Waldon's claims and affirm his conviction and sentence.

I.

Karl T. Waldon was a sworn deputy sheriff of the Jacksonville Sheriff's Office ("JSO"), serving as a member of the SWAT team from 1994 to 1997. In April 1997, Waldon began serving as a narcotics detective for JSO. In November of that same year, Officers Aric Sinclair and Jason Pough were also assigned to the narcotics unit. Sinclair and Pough brought with them to their new unit a penchant for stealing money from drug dealers, including a local dealer named Daryl Crowden. These illicit activities flourished when they were placed in Waldon's division, and Waldon soon joined in. The three absconded drugs and money from

2

criminals for their own use, often reselling the drugs through other dealers for profit, and eventually began burglarizing houses and hotel rooms of known drug dealers. Crowden soon became the trio's partner in crime, informing the officers of potential hits and purchasing the drugs they stole.

**The Safar Murder:**

In 1998, Sinclair took a job doing off-duty security work for South Trust Bank. After noticing that two bank customers, convenience store owner Sami Safar and his nephew Hassam Tahhan, routinely withdrew large amounts of cash for their business, Sinclair concocted a plan with Crowden to rob the men. On May 15, Crowden and Jeffrey Reed arrived at the bank while Tahhan was inside. When Tahhan returned to his car with a money bag containing approximately $50,000, Reed pointed a gun at him, grabbed the bag and fled with Crowden. Crowden then gave Sinclair $20,000 of the stolen money.

Upon learning of the Tahhan robbery, Waldon told fellow officer Reginald Bones that he "would like to get a hit like that." Waldon approached Sinclair, who provided him with a description of Safar's vehicle but refused to assist him in another robbery because "the heat [was] on" from the first robbery. Pough also refused to help, so Waldon recruited Officer Bones and recovering drug addict and convicted felon Kenneth McLaughlin to assist in pulling off the heist. According

3

to the plan, Bones would drive over to the bank and notify Waldon when he saw Safar's truck. Waldon would then pull over Safar as if conducting a routine traffic stop, and Bones and McLaughlin would rush in, pepper spray the driver, steal his money and flee. Bones, however, backed out on the day of the robbery and Waldon was forced to reschedule the heist for the following week. In the meantime, Waldon's brother-in-law, James Swift, asked Waldon for a loan. Waldon told him that he could make the loan if Swift could help him to collect some money supposedly owed to him by a drug dealer.

On July 3, 1998, Waldon, in his squad car, and McLaughlin and Swift in a Maxima, arrived at a location near the bank. Swift was instructed to alert Waldon when Safar left the bank. Waldon's new plan was to pull over Safar, create a reason to arrest him, and take him away – at which point Swift and McLaughlin would take the money from Safar's car. The plan was proceeding accordingly. However, when Waldon arrested Safar, he refused to part with his money. Waldon called McLaughlin and Swift on a cell phone and told them to follow his squad car. The three continued to talk as they drove, and Waldon became very anxious because "the person had seen his face." The men finally stopped in a parking lot to decide what to do, and Waldon decided that Safar had to be "taken out." McLaughlin objected and the three began yelling at each other, at which point

4

Waldon decided to relocate to another parking lot.

At the second parking lot, Waldon stepped out of his car with a black rope in his hand and yelled at Swift and McLaughlin to get out of their car. At first they refused, but then reluctantly approached Waldon's car. Waldon opened the back door and Safar, still handcuffed behind his back, began begging for his life. With McLaughlin blocking Safar's exit, Waldon followed Safar into the back seat, put the rope around his neck and choked him. Safar fell between the seat and the cage of the squad car and Waldon ordered McLaughlin to get into the back seat and finish "choking him out." Safar uttered his last breath as McLaughlin climbed into the back seat and reached for the rope. After McLaughlin informed Waldon that Safar was dead, Waldon frantically drove around the city with Swift in his patrol car and McLaughlin following in the Maxima. Eventually, Safar's body was transferred to the Maxima and subsequently dumped by McLaughlin in a secluded area. The three later met at Swift's apartment to divvy out the money and clean up their tracks.

**Waldon's Grand Jury Testimony:**

In late 1999, two drug dealers were arrested and began cooperating with federal authorities regarding potential corruption in the JSO. The two dealers soon fingered Crowden, who agreed to cooperate and recorded several conversations

with Sinclair. Sinclair eventually learned that he was the subject of a federal grand jury investigation and that Waldon and Crowden were also being questioned.

Consequently, on February 15, 2000, Waldon was served with a federal grand jury subpoena, accompanied by a letter explaining that he was the subject of the investigation. Waldon appeared on February 16 and, under oath, lied about (among other things) the reason he had visited Sinclair at the bank and whether he recognized photos of Safar and Safar's truck.

Bones was later subpoenaed to testify before the grand jury but was not asked, nor did he volunteer, any information about the Safar incident. However, after his testimony he told a JSO detective that McLaughlin had information about Waldon. Law enforcement officers questioned McLaughlin three times in late May 2000, and, on the third occasion, he told them about the robbery and murder of Safar. Waldon soon learned of McLaughlin's cooperation, and told Pough "they [are going to] find Kenny [McLaughlin] somewhere with his head cut off." Soon after, Pough decided to cooperate with authorities.

In December 2000, Waldon, Sinclair and Swift were charged by federal indictment. On August 21, 2002, the government, to some extent utilizing "read-back" testimony from the previous grand jury, secured a second superseding indictment against Waldon, now containing a "Notice of Special Findings"

6

indicating the aggravating factor which it intended to prove at sentencing that would merit the death penalty.[1] After a jury trial, Waldon was convicted on all counts. At sentencing, however, the jury rejected the government's theory that Waldon murdered Safar for "pecuniary gain," one of the aggravating factors that would justify the death penalty for a felony murder conviction, and the district court judge sentenced Waldon to life imprisonment.

## II.

Waldon contends that the district court erred when it denied his motion to dismiss the second superseding indictment, which, he argues, was secured in violation of the Fifth Amendment's grand jury clause. We review Waldon's challenge to the district court's denial of his motion to dismiss the indictment under the abuse of discretion standard. *United States v. Pielago*, 135 F.3d 703, 707 (11th Cir. 1998). He raises a variety of "factors" he believes "cumulatively" amounted to a defective indictment: the grand jury proceedings that produced the second superseding indictment were (apparently) limited to agents re-reading previous grand jury testimony of material witnesses[2]; the government concealed from the

---

[1]This notice was required by the recently-amended Federal Death Penalty Act, which itself was amended in response to the Supreme Court's decision in *Ring v. Arizona* that the Sixth Amendment's jury trial guarantee requires that the death penalty aggravating factor determination be entrusted to the jury. 536 U.S. 584, 609 (2002).

[2]Waldon reaches this conclusion based on a report in the local newspaper that exhibits and materials were taken into the grand jury room, "but there was no parade of witnesses that

7

grand jury substantial, material exculpatory evidence; and the pretrial publicity accompanying this case prejudiced the grand jury. The flaw in Waldon's argument, however, is that none of these "factors," taken on their own, are legal errors. Therefore, these factors taken together do not "cumulatively" become errors merely because they occurred contemporaneously.

First, Waldon can point to no authority for his position that an indictment cannot be based on read-backs and hearsay witnesses. To the contrary, this Court has explicitly found that relying on such testimony *does not* merit dismissal of the indictment upon which the testimony was based. *United States v. Brown*, 872 F.2d 385, 387-88 (11th Cir. 1989). Though some courts have expressed criticism in relying solely on hearsay testimony, Waldon simply cannot overcome this Court's ruling in *Brown*, which involved virtually the exact scenario we are presented with here – read-back testimony of an investigating agent rather than direct testimony from the witnesses themselves. Our Court found that this did not result in the fundamental unfairness that would merit dismissal of the indictment. *Id*.

Waldon's second "factor" is equally unsupported by current jurisprudence, and, indeed, has been flatly rejected by the Supreme Court. He claims that the government's failure to present exculpatory evidence to the grand jury tainted the

greeted the first grand jury when it met."

8

second superseding indictment. Again this is simply not a legal error. The government is under no duty to bring exculpatory evidence to the grand jury's attention. *United States v. Williams*, 504 U.S. 36, 51-55 (1992). In *Williams*, Justice Scalia reasoned:

> Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system. If a "balanced" assessment of the entire matter is the objective, surely the first thing to be done--rather than requiring the prosecutor to say what he knows in defense of the target of the investigation--is to entitle the target to tender his own defense. To require the former while denying (as we do) the latter would be quite absurd. It would also be quite pointless, since it would merely invite the target to circumnavigate the system by delivering his exculpatory evidence to the prosecutor, whereupon it would have to be passed on to the grand jury--unless the prosecutor is willing to take the chance that a court will not deem the evidence important enough to qualify for mandatory disclosure.

*Id*. at 52. We are undoubtedly bound by these words. Simply bundling this perceived inequity with others does not permit this Court to make a ruling contrary to the Supreme Court's ruling in *Williams*.

Finally, Waldon argues that pretrial publicity prejudiced the grand jury. This case was undoubtedly the subject of much press in the Jacksonville area. Again, however, publicity is generally not a basis for dismissal of an indictment. *United States v. Washington*, 705 F.2d 489, 499 (D.C. Cir. 1983); *In re Grand*

9

*Jury*, 508 F. Supp. 1210, 1213 (S.D. Ala. 1980) ("(i)t does not appear that any indictment has thus far been dismissed on th(e) ground" that it was "induced by prejudicial publicity".) (citing 8 Moore's Federal Practice P 6.03(4), at 6-61 (2d ed. 1979)).  To the extent that this Court has not addressed the issue directly, we do so today.  This argument misconstrues the role of the grand jury, which is an "investigative and accusatorial [body] unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." *United States v. Calandra*, 414 U.S. 338, 349 (1974).  Since the concern over adverse publicity is its effect on the fairness of the ensuing *trial*, and not its effect on the grand jury, the trial court did not err in failing to dismiss the indictment on this ground.

In sum, because no individual errors underlying the district court's failure to dismiss the indictment have been demonstrated, no cumulative errors can exist. *See United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("If there are no errors or a single error, there can be no cumulative error.").  Accordingly, we affirm the district court's denial of Waldon's motion.

III.

Waldon next submits that, because the government failed to offer any evidence to prove the aggravating factor which would merit the death penalty under the FDPA, the jury should not have been death qualified from the start.  The

10

government, he claims, failed to offer any evidence that he murdered Safar for pecuniary gain. The government admits that, at least according to the jury's findings, it did fail to establish, as a matter of *fact*, that Waldon murdered Safar to separate him from his money. It acknowledges that the jury rejected its factual theory, and found only that Safar was killed by Waldon because "he saw Waldon's face." This challenge, the government asserts, is a factual challenge to the sufficiency of the evidence, and not one that would have precluded the district court from death qualifying the jury at the outset.

There is a significant disagreement between the parties as to the proper standard of review applied to Waldon's assertion that the jury should not have been death qualified. Citing *Johnson*, the government claims that, because Waldon did not raise this argument when the government filed its notice of the aggravating factor it intended to prove, our standard of review is plain error. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997). Waldon insists that because the government did not have the evidence to prove the aggravating factor, then, as a matter of law, the jury should not have been death qualified. He submits he did not know, and could not have known, of this argument, however, until after the evidence came in. On this point, we agree with Waldon. We cannot hold him to the plain error standard of review when he did not know until the penalty phase that the

11

government would fail in its effort to prove the aggravating factor. Thus, we will review the district court's death qualification of the jury *de novo*.

The FDPA sets out a very specific procedure that must be followed by the government when it seeks the death penalty against a federal defendant. Section 3593, subsection (a), requires the government to sign and file with the court a notice: (1) stating that the government believes a sentence of death is justified and that the government will seek such sentence; and (2) setting forth the aggravating factor that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death. 18 U.S.C. § 3593(a). Subsection (b) then provides that, after the defendant is found, or pleads, guilty, a separate sentencing hearing shall be conducted to determine the punishment to be imposed. *Id*. at (b).

The government complied with this procedure. It filed a pretrial notice that it intended to seek the death penalty against Waldon, and indicated in that notice that it intended to prove that Waldon murdered Safar for pecuniary gain – one of the aggravating factors justifying the death sentence under the FDPA. After Waldon was found guilty, the district court held a sentencing hearing, with the jury present, and the government put on evidence in an attempt to prove the aggravating factor. At the end of this presentation of evidence, Waldon's counsel asked essentially for a judgment of acquittal on the death penalty, arguing that the

12

government failed to offer a shred of evidence to show that Waldon murdered Safar to separate him from his money and thus, as a matter of law, Waldon could not be subjected to the death penalty. The district court took the motion under advisement and let the issue go to the jury. The jury found Waldon not guilty of the sole statutory aggravating factor.

Waldon cites *Reed v. State*, 496 So. 2d 213 (Fla. 1st DCA 1986) in support of his argument, which involved a defendant charged with (and ultimately convicted of) first-degree felony murder and robbery. Prior to trial on the charges, defendant in *Reed* moved, pursuant to *Enmund v. Florida*, to preclude death qualification of the jury.[3]  *Id*. at 214. The State argued that, while it could not represent how the evidence would support consideration of the death penalty before trial, it should not be precluded "from seeing what might develop during trial." *Id*. At the end of its case-in-chief, however, the State conceded that *Enmund* dictated and the death penalty was not available. *Id*. Florida's First District Court of Appeal reversed Reed's conviction and remanded for a new trial, finding that, because the State could not point to any facts, prior to trial, that it felt

---

[3]The Supreme Court in *Enmund* held that the Eighth Amendment does not permit imposition of the death penalty on one who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Enmund v. Florida*, 458 U.S. 782 (1982).

13

could support imposing the death penalty (after nineteen months and two separate trials of Reed's accomplice), it was error to death qualify the jury. *Id.*

Though, at first blush, *Reed* appears to support Waldon's position, his argument fails because we are bound by the Supreme Court's decision in *Buchanan v. Kentucky*, 483 U.S. 402 (1987). In that case, which posed the question whether a defendant's Sixth Amendment rights were violated when the state was permitted to death qualify the jury in defendant's joint trial where the death penalty was sought against his co-defendant, but not against him, the Court flatly rejected the notion that trial by a death qualified jury deprives a defendant of his Sixth Amendment right to an impartial jury. *Id.* at 415. Justice Blackmun rejected defendant's argument and reasoned:

> [I]f petitioner's position – that, because a "death-qualified" jury is conviction prone and likely to mete out harsher sentences, it should be used only in the capital case – were accepted, its logic would lead to an anomalous result: if, as in [co-defendant]'s case, a capital defendant also is charged with noncapital offenses, according to petitioner there would have to be one trial for those offenses and another for the capital offense.

*Id.* at 419. As such, *Buchanan* entirely forecloses Waldon's argument.

Even if we were to consider *Reed*, as Waldon would have us do, we believe it must be read in conjunction with the First D.C.A.'s later decision in *Smith v. State*. In *Smith*, that court held that an inquiry into the motives of the state behind

14

seeking the death penalty can be made by the trial court judge *only*: (1) when the defendant has properly requested an inquiry after trial *and*, more importantly, (2) when the facts indicate evidence of *bad faith*. 568 So. 2d 965, 968-69 (Fla. 1st DCA 1990). Taking the facts in the light most favorable to the government, there was evidence introduced that could have been the basis of a finding that Waldon murdered Safar for pecuniary gain. The mere fact that the jury did not so conclude is no indication of bad faith on the part of the prosecution.

## IV.

As noted above, the government went before the grand jury on two separate occasions. Prior to the issuance of the first indictment, Waldon was subpoenaed to testify to the grand jury, where he was identified as a "subject" of the investigation of various crimes.[4] It is this testimony that is the subject of Waldon's next issue on appeal. He claims that the district court erred in denying his motion to suppress this testimony. We review the district court's denial of Waldon's motion to

---

[4]Waldon takes issue with this apparent "target of the investigation" versus a mere "subject" distinction, and claims that, because he was actually a target, he was more than just a witness when he testified. We find the distinction irrelevant here. Because the grand jury was conducting a legitimate investigation in which it believed Waldon had information as a subject, there was nothing improper about issuing a subpoena for his testimony. As such, we reject Waldon's Sixth Amendment ineffective assistance claim on this issue out-of-hand, because the Sixth Amendment right to counsel simply does not attach until the initiation of formal adversary proceedings. *United States v. Gouveia*, 467 U.S. 180, 189 (1984). Whether Waldon was a "subject" or "target" of the investigation at the time he testified, he simply had no constitutional right to counsel.

15

suppress *de novo*. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).

Waldon claims that his Fifth Amendment rights were violated because, akin to *Garrity* and its progeny, his testimony was compelled. *Garrity v. New Jersey*, 385 U.S. 493 (1967). He asserts that he reasonably believed he would lose his job as a JSO officer if he invoked his Fifth Amendment privilege before the grand jury. The trial court rejected this argument, finding that "even if the defendant subjectively believed that he was required to testify, his belief was not objectively reasonable."

Before a police officer's testimony will be considered "coerced" within the meaning of *Garrity*, he must show that he subjectively believed that he would lose his job if he refused to answer questions and that his belief was objectively reasonable. *United States v. Vangetes*, 287 F.3d 1315, 1322 (11th Cir. 2002). A subjective belief is not objectively reasonable unless it derived from actions of the governmental unit. *Id*. at 1323. The government argues that Waldon has failed to identify any law or regulation that *required* him to testify under threat of sanctions. Indeed, it appears that the regulations he relies upon reflect only a general expectation that police officers will cooperate and testify. Waldon argues that his belief that he would lose his job was objectively reasonable because, taking the

16

"totality of the circumstances" – including the Jacksonville Municipal Code requirement that the city reserves the right to discipline employees exercising their Fifth Amendment privilege and the Sheriff's "virtually unfettered discretion" to discipline employees – the likely effect of him not testifying was termination.

We agree with the district court that Waldon's belief was not objectively reasonable. However, the point does not need to be belabored because Waldon undisputedly lied to the grand jury, and *Garrity* does not protect false testimony. *United States v. Veal*, 153 F.3d 1233, 1240-41 (11th Cir. 1998); *United States v. Olmeda*, 839 F.2d 1433, 1436-37 (11th Cir. 1988). Similarly, there is no "perjury trap" when uncooperative witnesses lie in response to questions related to legitimate investigations. *United States v. Regan*, 103 F.3d 1072, 1079 (2d Cir. 1997). For these reasons, we affirm the district court's denial of Waldon's motion to suppress.

V.

Finally, Waldon argues that, because the jury did not "recommend" either death or life imprisonment, the plain language of 18 U.S.C. § 3594 prohibited the district court from sentencing him to any sentence but a "lesser sentence." The district court's interpretation of the penalty portion of the Federal Death Penalty Act is reviewed *de novo*. *United States v. Pistone*, 177 F.3d 957, 958 (11th Cir.

17

1999).

The statute reads as follows:

> Upon a recommendation under section 3593(e) that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly.  Otherwise, the court shall impose any lesser sentence that is authorized by law.

18 U.S.C. § 3594.  Waldon submits that the latter provision mandates a lesser sentence because the jury here did not "recommend" either death or life imprisonment.

Waldon's argument misapprehends the reach of the FDPA.  The jury rejected the government's theory on the aggravating factor and found him "not guilty," and thus rejected application of the FDPA altogether.  Upon doing so, as the district court accurately concluded, the FDPA ceased to apply, and the Sentencing Guidelines dictated Waldon's sentence.  The Fifth Circuit affirmed a similar finding in evaluating the death penalty procedures of 21 U.S.C. § 848 – procedures akin to those set forth in the FDPA.  *United States v. Flores*, 63 F.3d 1342, 1367 (5th Cir. 1995).  Affirming the district court's refusal to instruct the jury that its only alternative, if it did not recommend the death penalty, was life imprisonment without parole, the court found:

> Under § 848(e), if the jury had not recommended a death

18

> sentence, the district court could have sentenced Garza to "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment." The district court would then have been required to follow the Sentencing Guidelines to arrive at an appropriate sentence.

*Id*. We adopt the same logic here. When the jury found Waldon "not guilty" of killing Safar for pecuniary gain, the district court correctly applied the Sentencing Guidelines when it sentenced Waldon to life imprisonment.

VI.

For the reasons set forth above, we AFFIRM Waldon's conviction and sentence.

AFFIRMED.