[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12354

_____

D. C. Docket No. 02-00027-CR-CAR-5-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DWIGHT D. YORK,
a.k.a Malakai Z. York, etc.

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(October 27, 2005)**

Before BIRCH, HULL, and BOWMAN[*], Circuit Judges.

PER CURIAM:

Defendant-Appellant Dwight D. York appeals his convictions and 1,620-

month sentence. After review and oral argument, we affirm.

_____

[*]The Honorable Pasco M. Bowman, II, of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

# I. BACKGROUND

Dwight D. York ("York") is the leader of the United Nation of Nuwaubian Moors, a religious ministry/Native American tribe that has existed in some form since the 1960s.[1] Over the years, the Nuwaubian organization's official philosophy (as well as its name) has changed several times, alternatively finding its basis in Islamic, Hebrew, ancient Egyptian, Yamasee Indian, and various other cultures and religions. The organization was founded in Brooklyn, New York; however, in approximately 1990 the Nuwaubians moved to a farm in Sullivan County, New York. In early 1993, York began to move the Nuwaubians from Sullivan County to a large plot of land in Eatonton, Georgia.

On November 21, 2003, a grand jury in the United States District Court for the Middle District of Georgia (Macon Division) returned a second superseding indictment (the "Indictment"),[2] which formed the basis for York's fourteen-day trial in January 2004. The Indictment contains thirteen counts.

---

[1] York is known by several names, including "Malakai Z. York," "Malachi York," "Isa Muhammad," "Isa Alihad Mahdi," and "Baba." For the sake of consistency, we refer to him as "York."

[2] Initially, York and an alleged co-conspirator were indicted on four counts arising out of their alleged interstate transport of minors for unlawful sexual activity. The original indictment was first superseded in order to facilitate a guilty plea by York to one count of interstate transport of a minor for unlawful sexual activity; however, York's plea agreement was rejected by the district court. York subsequently withdrew his guilty plea, and the Indictment (on which York was ultimately tried) was returned by the grand jury on November 21, 2003.

Specifically, Count One charges York with a Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(d). Count Two charges a substantive RICO offense, in violation of 18 U.S.C. § 1962(c). The RICO counts are predicated on specific instances in which York (1) engaged in the interstate transport of minors with the intent to engage in unlawful sexual activity; (2) engaged in interstate travel for the purpose of engaging in unlawful sexual activity with minors; and (3) unlawfully structured cash transactions in order to avoid federal reporting requirements. Count Three charges York with general criminal conspiracy to engage in the interstate transport of minors with the intent to engage in unlawful sexual activity, as well as with conspiracy to unlawfully structure cash transactions to avoid federal reporting requirements, in violation of 18 U.S.C. § 371.

Counts Four, Five, Six, and Eight charge York with the specific interstate-transport-of-minors-for-sex acts that form the basis for those predicate acts in the RICO and conspiracy counts, in violation of the Mann Act, 18 U.S.C. § 2423(a). Specifically, Count Four charges the interstate transport of a minor, identified as "I.J.," from Sullivan County, New York to Eatonton, Georgia in February 1993. Count Five charges the interstate transport of three minors, identified as "K.H.," "A.N.," and "D.N.," from Sullivan County to Eatonton in April 1993. Count Six

3

charges the interstate transport of a minor, identified as "A.T.," from Kings County, New York to Georgia in April 1993. Count Eight charges the interstate transport of three minors, identified as "A.N.," "K.L.," and "S.W.," from Georgia to Florida in 1996.

Count Seven charges York with a 1996 act of interstate travel from Georgia to Florida for the purpose of engaging in unlawful sexual activity with minors, in violation of the Mann Act, 18 U.S.C. § 2423(b). The minors in Count Seven are the same minors named in Count Eight.

Counts Nine, Ten, and Eleven charge York with the acts of unlawfully structuring cash transactions that form the basis for those predicate acts in the RICO and conspiracy counts of the Indictment. Specifically, Counts Nine, Ten, and Eleven charge York with three acts of unlawfully structuring cash transactions to avoid federal reporting requirements in violation of 31 U.S.C. § 5313(a) and 31 U.S.C. § 5324(a)(3). Count Nine charges York with unlawfully structuring cash transactions on or about September 29-30, 1999. Count Ten charges York with unlawfully structuring cash transactions on or about October 6-8, 1999. Count Eleven charges York with unlawfully structuring cash transactions on or about April 5-11, 2000. Finally, Counts Twelve and Thirteen are forfeiture counts.

At trial, there was substantial evidence that under York's leadership, the

4

Nuwaubians' lifestyle was highly restricted.[3] York had many "wives" who served his business and personal needs. York's followers were expected to abide by his rules or risk punishment or expulsion from the Nuwaubian organization. Men and women did not live together; children beyond toddler age were generally separated from their parents; and children were separated by sex and age and lived in different buildings and rooms accordingly. Children were home-schooled and usually interacted with their biological parents for only specific, short periods of time.

Several witnesses testified that York, both in Sullivan County, New York and in Eatonton, Georgia, as well as in Athens, Georgia, engaged in a regular course of sexual contact with underage children within the Nuwaubian organization, including oral, vaginal, and anal sex. Some of the children were as young as six years old when the initial sexual contact with York occurred. Certain of York's "wives" and older sexual partners (some still underage themselves) helped recruit or encourage younger children to participate in sex acts with York.

Additionally, there was substantial evidence that York owned and operated a number of stores and outlets throughout the country that sold religious and non-

---

[3]We discuss the evidence in the light most favorable to the government and recognize that York vigorously denies the government's version of events. See United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

religious Nuwaubian items. A "finance office" in Eatonton, Georgia, staffed by various Nuwaubians, was responsible for collecting and handling the profits from York's businesses. In addition to the sex crime evidence at trial, witnesses testified that York instructed the workers in the "finance office" never to deposit $10,000 or more in cash into any of his bank accounts at any given time, in order to evade federal cash transaction reporting requirements.

The jury convicted York on eleven of the thirteen counts in the Indictment, acquitting York on Counts Eight and Twelve. The district court sentenced York to the statutory maximum prison term on each count of conviction, to be served consecutively, yielding a total sentence of 1,620 months' incarceration. York timely appealed.

## II. ISSUES ON APPEAL

On appeal, York raises several assignments of error, including: (1) the Indictment misjoined the sexual abuse charges with the financial-structuring charges, and the district court erred in refusing to sever those charges; (2) the district court erred in refusing to dismiss the RICO counts because the United Nation of Nuwaubian Moors is not an "enterprise" under RICO and because there is an insufficient connection between York's alleged acts and the Nuwaubian organization; (3) the district court erred in refusing to dismiss the Indictment

because the Indictment was improperly returned by a grand jury tainted by pre-trial publicity; (4) the district court erred in allowing the government to call a certain witness in rebuttal, and further erred by refusing to allow York to call his own rebuttal witness thereafter; (5) there was insufficient evidence to convict York of the charges that he transported minors in interstate commerce with the intent that the minors would engage in unlawful sexual activity, and further, the government did not put forth sufficient evidence to prove that any underlying sexual activity undertaken by York was actually unlawful; (6) the district court erred in denying York's motion to dismiss two counts of the Indictment because the minor victim was undisputedly over the age of consent at the time the sexual act took place;[4] (7) the district court erred in denying York a continuance when York switched lead counsel approximately two weeks before trial; (8) York's sentence violates the Sixth Amendment under United States v. Booker, 542 U.S. __, 125 S. Ct. 738 (2005), because the district court enhanced his sentence based on facts not reflected in the jury's verdict; (9) York's sentence is invalid under Booker because he was sentenced under a mandatory, rather than advisory, guidelines scheme; and (10) York's sentence violates the ex post facto clause of the Constitution because York was sentenced under the November 2000 edition of the United States

---

[4]This victim, however, was undisputedly under the age of consent at the time she was transported in interstate commerce from Sullivan County, New York to Eatonton, Georgia.

Sentencing Guidelines ("Guidelines") rather than under the November 1993 edition of the Guidelines.[5]

## III. DISCUSSION

After careful review of the voluminous record in this case, as well as the arguments of the parties in both their briefs and at oral argument, we conclude that all of York's claims of error lack merit.[6] Only York's pre-trial publicity and severance claims, along with York's three assignments of sentencing error, warrant further discussion.

## A. Pre-Trial Publicity

In late October 2003, the district court granted York's motion to change

---

[5]York also asserts that his post-trial counsel was ineffective in that, without York's express consent, he withdrew a motion for judgment of acquittal and a motion for new trial, both of which were initially filed by York's trial counsel. We conclude that York's ineffective assistance of counsel claim is not properly before us at this time because the record below is not sufficiently developed to adequately address the merits of York's argument. See United States v. Camacho, 40 F.3d 349, 355 (11th Cir. 1994), overruled in part on other grounds by United States v. Sanchez, 269 F.3d 1250 (11th Cir. 2001); see also Massaro v. United States, 538 U.S. 500, 504-05, 123 S. Ct. 1690, 1694 (2003) (holding that "in most cases" it is preferable that a motion for ineffective assistance of counsel be raised on collateral review rather than on direct appeal). As such, we do not reach this claim.

[6]The decision to permit rebuttal testimony lies in the sound discretion of the trial court. United States v. Gold, 743 F.2d 800, 818 (11th Cir. 1984). A district court's denial of a motion for mistrial is also reviewed for abuse of discretion, as is the denial of a motion for continuance. United States v. Chastain, 198 F.3d 1338, 1352 (11th Cir. 1999); United States v. Wright, 63 F.3d 1067, 1071 (11th Cir. 1995); United States v. Verderame, 51 F.3d 249, 251 (11th Cir. 1995). We review a defendant's challenge to the sufficiency of the evidence de novo, taking all reasonable inferences in the government's favor. United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999).

8

venue and ordered that the location of York's trial be moved from the United States District Court for the Middle District of Georgia (Macon Division) to the United States District Court for the Southern District of Georgia (Brunswick Division).  In its change-of-venue order, the district court "first note[d] that the Government has not objected to Defendant's motion."  The district court then stated that it had "grave concerns about trying to select a jury in this case in any division in the Macon and Atlanta media markets" and concluded that York could not receive "a fair and impartial trial" if the trial were to take place in Macon.[7]

Approximately one month <u>after</u> the change-of-venue order, the grand jury issued the second superseding indictment (the Indictment), on which York was ultimately tried.  The grand jury was chosen from the same pool of individuals from which any trial jury would have been chosen if York's trial had actually taken place within the Middle District of Georgia (Macon Division).

After the Indictment issued in November 2003, York moved for its dismissal, arguing that if the trial jury pool was tainted by pre-trial publicity as of October 2003, then it must follow that the Indictment—issued by a Macon-area grand jury approximately one month after the change-of-venue order—must also

---

[7]York's appeal, however, properly comes to this Court from the United States District Court for the Middle District of Georgia (Macon Division), where the Nuwaubians' Eatonton, Georgia compound is located and the Indictment was returned.

9

be tainted due to pre-indictment publicity. The district court denied York's motion, concluding that York "failed to show that the pre-indictment publicity resulted in actual bias or prejudice against him" before the grand jury. The district court found that the existence of pre-trial publicity by itself, or even evidence that the grand jury may have been aware of the publicity, was insufficient to carry York's burden of showing actual bias or prejudice in the grand jurors' decision to indict. The district court concluded that the grand jury need not deliberate in a "'sterile chamber'" and that pre-trial publicity alone was an inadequate ground upon which to base the dismissal of the Indictment.

With regard to its change-of-venue order, the district court drew a distinction between the role of the grand jury and a trial jury, pointing out that the grand jury is an investigative and accusatorial body "'unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.'" The district court then classified its earlier decision to permit a change of venue as one taken out of "an abundance of caution" and found that dismissal of the Indictment was "far too extreme a remedy under these circumstances."

The district court's refusal to dismiss the Indictment based on pre-trial publicity was not error, much less reversible error.[8] First, our decision in United

---

[8]We review the district court's denial of a motion to dismiss an indictment for abuse of discretion, although the legal sufficiency of the allegations in an indictment is a question of law

10

States v. Waldon, 363 F.3d 1103, 1109-10 (11th Cir. 2004), is controlling.  In that case, as here, the defendant Waldon argued that pre-trial publicity prejudiced the grand jury such that dismissal of his second superseding indictment was required.  Moreover, just as in this case, the Waldon Court recognized that "case was undoubtedly the subject of much press in the Jacksonville area."  Waldon, 363 F.3d at 1109.  Nevertheless, this Court squarely held in Waldon that "publicity is generally not a basis for dismissal of an indictment."  Id.  In Waldon, we pointed out that the defendant's pre-trial publicity argument misconstrued "the role of the grand jury, which is an 'investigative and accusatorial [body] unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.'"  Id. (quoting United States v. Calandra, 414 U.S. 338, 349, 94 S. Ct. 613, 620 (1974)).  We concluded that the Waldon district court did not err in failing to dismiss the indictment on the grounds of pre-trial publicity because "the concern over adverse publicity is its effect on the fairness of the ensuing trial, and not its effect on the grand jury."[9]  Id. at 1109-1110.

Although Waldon governs here, York nevertheless argues that his situation

that is reviewed de novo.  United States v. Waldon, 363 F.3d 1103, 1108 (11th Cir. 2004); United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002).

[9]Moreover, in Waldon, we noted that "it does not appear that any indictment has thus far been dismissed on the ground that it was induced by pretrial publicity," and York cites no such case.  Waldon, 363 F.3d at 1109 (quotation marks, citations, and alterations omitted).

11

is distinguishable from, and not controlled by, Waldon because in his case, the district court issued a change-of-venue order on the specific ground of excess pre-trial publicity and expressly noted its "grave concerns" about picking a trial jury from the Macon area. In other words, York argues that Waldon does not bind the panel in this case because here, it was "'judicially recognized'" that the jury pool in Macon was unduly influenced by pre-trial publicity.

We reject York's argument because the amount of the pre-trial publicity in Waldon was not the basis for the Waldon decision; indeed, in Waldon, we expressly assumed a high level of pre-trial publicity. See id. at 1109. Rather, our decision in Waldon was based on the entirely different functions of the grand jury vis-a-vis the trial jury and the different types of evidentiary restrictions before each body. The point in Waldon was, and the point remains today, that the grand jury is not impeded by the evidentiary and procedural restrictions applicable to trial juries. Id. A grand jury investigation "may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." Calandra, 414 U.S. at 344, 94 S. Ct. at 618. Moreover, "[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." Id. at 344-45, 94 S. Ct. at 618. As a result, the district court's conclusion that a change-of-trial-venue from the Macon

12

area was warranted does not necessarily mean, as York argues, that the district court erred in refusing to dismiss the Indictment issued by a grand jury from the Macon area.

We do recognize that Waldon states that publicity is "generally not a basis for dismissal of an indictment." Waldon, 363 F.3d at 1109 (emphasis added). We further acknowledge that York maintains that Calandra requires dismissal of his Indictment because the Supreme Court recognized in Calandra that the grand jury is not merely an investigative body but also an institution that exists for "the protection of citizens against unfounded criminal prosecutions." Calandra, 414 U.S. at 343, 94 S. Ct. at 617. However, York fails to explain how his prosecution was rendered "unfounded" by the publicity that surrounded the Indictment. This is particularly true given Calandra's specific recognition that an indictment's validity is not affected by the type of evidence considered by a grand jury. Id. at 344-45, 94 S. Ct. at 618-19.

More importantly, and in any event, York has failed to establish that publicity surrounding his case "substantially influenced" the ultimate decision to indict him and thereby caused him actual prejudice. Bank of Nova Scotia v. United States, 487 U.S. 250, 256, 108 S. Ct. 2369, 2374 (1988) (dismissal of indictment due to error in grand jury proceedings is only appropriate where "'it is

13

established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations") (citation omitted). Indeed, York overstates the significance of the district court's change-of-venue order, given that York's venue motion was unopposed and the district court later described its decision to grant the venue motion as a decision taken out of "an abundance of caution." For all of these reasons, and based on the record and factual circumstances of this case, we reject York's argument that the district court erred in denying his motion to dismiss the Indictment due to pre-trial publicity.

## B.     Severance

York alternatively asserts that the Indictment misjoined the sexual abuse charges with the unlawful financial structuring charges, and that the district court abused its discretion in denying his motion to sever those charges.[10] In response, the government emphasizes that these charges are not totally unrelated and that there was evidence at trial that York staffed his "finance office" with only women and preferred that the positions of greatest responsibility within the "finance office" be staffed only by women with whom York had previously had a sexual

---

[10]This Court reviews de novo whether the government's initial joinder of criminal charges was proper under Federal Rule of Criminal Procedure 8. We then review the district court's subsequent denial of a motion to sever for abuse of discretion. United States v. Hersch, 297 F.3d 1233, 1241 (11th Cir. 2002).

14

relationship.

In order to show that the district court wrongly denied his motion to sever, York must show that he suffered "actual prejudice" from any misjoinder that allegedly may have occurred. See United States v. Hersh, 297 F.3d 1233, 1242-43 & n.14 (11th Cir. 2002) (regardless of whether or not charges were initially misjoined, in order to show that the district court abused its discretion in denying a motion to sever, the defendant must demonstrate that he suffered "actual prejudice" or "compelling prejudice" from the misjoinder that caused "'substantial and injurious effect or influence in determining the jury's verdict'") (citation omitted).

Here, we readily conclude that York has failed to show that he suffered "actual prejudice" from the alleged misjoinder of the charges and the denial of his severance motion. Id. at 1243 (finding no actual prejudice where child pornography charges were allegedly misjoined with charges of child molestation, and holding that "'more than some prejudice must be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice'" via more than "'conclusory allegations'") (citation omitted). Although York conclusorily asserts that the alleged misjoinder "unfairly circumvented" the statute of limitations for many of the alleged sex acts, York also acknowledges that the RICO charge rendered any statute of limitations argument moot, stating in his

15

reply brief that "[h]ad it not been for the umbrella of RICO, these acts would not have been prosecutable." See also United States v. Welch, 656 F.2d 1039, 1051 & n.20 (5th Cir. Unit A Sept. 1981) (substantive RICO and RICO conspiracy charges "can provide an overall connection that will allow the joinder of seemingly unrelated acts");[11] United States v. Starrett, 55 F.3d 1525, 1544-45 (11th Cir. 1995) (five-year statute of limitations for substantive RICO charge only requires that at least one predicate act be committed within five years of the date defendant was charged in the indictment).

Moreover, the jury was expressly instructed that it was to consider each count of the Indictment separately and was further instructed that merely finding York guilty of one charged offense was not to influence its verdict as to the other charged offenses. In Hersh, we found a similar limiting instruction significant in affirming a district court's denial of a motion to sever. Hersh, 297 F.3d at 1244 ("'If the possible prejudice may be cured by a cautionary instruction severance is not required.'") (citation omitted). Further, the jury acquitted York on two of the thirteen counts, evincing that it considered each count separately. For all of the foregoing reasons, the district court did not abuse its discretion in denying York's motion to sever.

---

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

**C.     Sentencing**

We first outline the manner in which York's sentence was calculated and then review his sentencing claims.

**1.     Pre-Sentence Investigation Report and Sentencing Hearing**

Prior to York's sentencing, a probation officer prepared a Pre-Sentence Investigation report ("PSI") utilizing the November 2000 edition of the Guidelines.[12]  The PSI recommended a base offense level of twenty-seven, under U.S.S.G. §§ 2G1.1(c)(2), 2A3.1, and 3D1.1 (2000).[13]  The PSI also recommended (1) a four-level increase under U.S.S.G. § 2A3.1(b)(2)(A) because the victim in each relevant group was under age twelve when he or she was first molested by York; (2) a two-level increase under U.S.S.G. § 2A3.1(b)(3)(A) because the victims were under York's care and supervisory control; (3) a four-level increase under U.S.S.G. § 3B1.1(a) because York exercised a leadership role and/or the Nuwaubian enterprise involved more than five participants and was otherwise

_____

[12]Although York argues in his briefs that he was improperly sentenced under the November 2002 edition of the Guidelines, it is clear from the PSI and the transcript of the sentencing hearing that York was in fact sentenced under the November 2000 edition of the Guidelines.  See PSI ¶ 69; Tr. of Apr. 22, 2004 Sentencing Hr'g at 3.  Accordingly, we will construe York's ex post facto claim as a claim that York was improperly sentenced under the November 2000 edition of the Guidelines (hereinafter, the "2000" edition of the Guidelines).

[13]Specifically, the PSI grouped relevant counts together pursuant to U.S.S.G. § 3D1.1 and used the groups that produced the highest total offense levels (those groups dealing with the interstate transport of minors for sexual activity) to compute York's base offense level at twenty-seven.

17

extensive; and (4) a two-level increase under U.S.S.G. § 3B1.4 because York utilized a person under the age of eighteen to commit the offense. These increases resulted in an adjusted offense level of thirty-nine. The PSI then applied a multiple-count adjustment of four levels, pursuant to U.S.S.G. § 3D1.4, for a combined adjusted offense level of forty-three. York's criminal history category of I and adjusted offense level of forty-three yielded a Guidelines range of life imprisonment.

York filed several written objections to the PSI. York's objections asserted that the 1993 edition of the Guidelines—rather than the 2000 edition—should have been used to calculate his sentence, and that the use of the 2000 edition of the Guidelines violated the ex post facto clause of the Constitution. York did not, however, raise any Booker objections in the district court.

At York's sentencing hearing, the district court adopted the findings in the PSI and rejected York's ex post facto argument. Given that York's Guidelines range was life imprisonment on each count, the district court then sentenced York to the statutory maximum for each count of conviction, with the sentence on each count to run consecutively. Specifically, the district court sentenced York to 240 months' imprisonment on Count One; 240 months' imprisonment on Count Two; 60 months' imprisonment on Count Three; 180 months' imprisonment on Count

18

Four; 180 months' imprisonment on Count Five; 180 months' imprisonment on Count Six; 180 months' imprisonment on Count Seven; 120 months' imprisonment on Count Nine; 120 months' imprisonment on Count Ten; and 120 months' imprisonment on Count Eleven, for a total sentence of 1,620 months' imprisonment.

At sentencing, the district court expressly stated that it found York's sentence "appropriate" in light of "the nature of the crimes, the victims involved, the length of the offense, and the totality of the circumstances." At no point during sentencing did the district court indicate that it desired to impose a lesser sentence than that called for by the Guidelines, or that it felt that the Guidelines range was overly harsh.

### 2. **Booker** Error

On appeal, York does not contend that there is insufficient evidence to support the district court's findings of fact as to his specific sentencing enhancements, or that the district court legally misapplied or miscalculated those sentencing enhancements. York simply contends that his sentence violates Booker because the district court imposed extra-verdict sentencing enhancements under a mandatory Guidelines scheme.

This Court recently recognized that there are two types of Booker error,

constitutional and statutory. United States v. Mathenia, 409 F.3d 1289, 1291-92 (11th Cir. 2005). "The constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge; the error is in the mandatory nature of the guidelines once the guidelines range has been determined." United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, __ U.S. __, 125 S. Ct. 2935 (2005). Meanwhile, "statutory error occurs when the district court sentences a defendant 'under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation.'" Mathenia, 409 F.3d at 1291 (citation omitted). York argues that the district court committed both constitutional and statutory Booker error.

Because York did not raise his Booker claims before the district court, we review those claims only for plain error. Rodriguez, 398 F.3d at 1298. In order to establish plain error, York must show "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" Id. (citation omitted). "'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (citation omitted).

Turning first to York's claim of constitutional Booker error, there is a substantial question as to whether the facts supporting the enhancements in York's

sentence were extra-verdict or well within the facts necessarily determined by the jury's verdict (i.e., whether the first prong of the plain-error test is present). The Indictment alleges that York (1) was the leader of a 5,000-person religious organization (the enterprise in the RICO count); (2) directed his followers, particularly the children, to view him as a god-like or father figure; (3) molested multiple minors, including several who were under age twelve at the time the specific acts charged in the Indictment took place; and (4) ordered minors to bring other minors to him for unlawful sexual activity. The jury convicted York of each count of the Indictment that alleges such conduct, arguably establishing most, if not all, facts necessary to support each enhancement imposed by the district court.

In any event, the district court did commit statutory Booker error by sentencing York under a mandatory Guidelines scheme. See United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005). Moreover, in order to satisfy the second prong of the plain-error test, Booker error need only be plain at the time of our appellate consideration. See Rodriguez, 398 F.3d at 1299 (citation omitted).

Although York has thus clearly shown statutory Booker error, and even assuming arguendo that he has also shown constitutional Booker error, we still affirm York's sentence because he has failed to establish that either error affected his substantial rights. "A defendant's substantial rights are affected when there is a

21

reasonable probability that the district court would have imposed a different sentence if the guidelines were not mandatory." United States v. Rivas-Ruiz, No. 04-13056, 2005 WL 2334375, at *2 & n.1 (11th Cir. Sept. 26, 2005) (concluding that the defendant failed to meet his burden of showing that his substantial rights were affected by Booker error because the record did not indicate what the district court would have done if the Guidelines were not mandatory); Rodriguez, 398 F.3d at 1299-1301 (concluding that where the effect of Booker constitutional error "on the result in the district court is uncertain or indeterminate . . . the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error").

Nothing in the transcript of York's sentencing hearing or elsewhere in the record establishes a "reasonable probability" that if the district court had sentenced York under an advisory Guidelines scheme rather than a mandatory Guidelines scheme, the district court would have imposed a lesser sentence. See Rodriguez, 398 F.3d at 1301; Rivas-Ruiz, 2005 WL 2334375, at *2 & n.1; see also United States v. Fields, 408 F.3d 1356, 1360 (11th Cir. 2005) ("Where '[w]e just don't know' whether the defendant would have received a lesser sentence if the guidelines had been advisory, the defendant has not met his burden of showing prejudice.") (citation omitted). If anything, the record shows that the district court

22

would not have imposed a lesser sentence because the district court specifically determined that the Guidelines range and York's 1,620 month sentence were "appropriate" in light of the "nature of the crimes, the victims involved, the length of the offense, and the totality of the circumstances." Compare Rodriguez, 398 F.3d at 1301 (third prong of plain-error test not met because record provides no reason to believe that district judge might have shortened defendant's sentence) with Shelton, 400 F.3d at 1332 (third prong of plain-error test met where district court "during sentencing expressed several times its view that the sentence required by the Guidelines was too severe"; classified defendant's criminal history category as "'unfortunate[]'"; sentenced defendant to low end of Guidelines range; and classified final sentence as "'more than appropriate'"). Accordingly, York's Booker claims fail because he has not met his burden with regard to the third prong of the plain-error test.

### 3.    Ex Post Facto Claim

Finally, we address York's argument that the district court improperly imposed sentencing enhancements based on U.S.S.G. § 2G1.1's ("Section 2G1.1") cross-reference to U.S.S.G. § 2A3.1 ("Section 2A3.1") in the 2000 edition of the Guidelines. York contends that the district court should have used the 1993 edition of the Guidelines, because his sex crimes should have been severed from his

23

financial crimes and his last sex crime concluded in 1993. York argues that the 1993 edition of the Guidelines contains no cross-reference to Section 2A3.1 and thus the district court's use of the 2000 edition of the Guidelines resulted in a more onerous sentence and violated the ex post facto clause of the Constitution.[14]

"Generally, a convicted defendant's sentence is based on the United States Sentencing Commission Guidelines Manual 'in effect on the date the defendant is sentenced.'" United States v. Bailey, 123 F.3d 1381, 1403 (11th Cir. 1997) (quoting 18 U.S.C. § 3553(a)(4)). However, if the Manual in effect on the date of sentencing violates the ex post facto clause of the Constitution, then the district court must use the Manual that was in effect on the date that the crime was committed. Id. A sentencing scheme violates the ex post facto clause "if it is enacted after the crime was committed and before sentencing, and its application results in a more onerous penalty." Id. at 1403 n.32. Further, if related crimes are committed in a series, the date of the crime at the end of the series governs the date of the Manual to be used.[15] Id. at 1404-05.

_____

[14]A defendant's claim that his sentence was imposed in violation of the ex post facto clause of the Constitution is a question of law that this Court reviews de novo. United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

[15]"The use of either the Sentencing Guidelines Manual in effect at sentencing or the one in effect when the crime was committed is known as the 'one book rule.'" Bailey, 123 F.3d at 1403 (explaining in detail that under the one book rule, only one edition of the Manual is to be applied in sentencing a defendant). York was sentenced in 2004, but no party contends that the 2004 Manual should have been used. The 2000 Manual was used instead, and York's only

24

We reject York's argument that his sentence violates the ex post facto clause for two reasons. First, as outlined above, the district court did not err in refusing to sever the sex charges from the financial charges. Thus, the district court properly refused to apply the 1993 edition of the Guidelines at York's sentencing because York's crimes continued well past 1993. See Bailey, 123 F.3d at 1404-05 ("[R]elated offenses committed in a series will be sentenced together under the . . . Manual in effect at the end of the series.").

Secondly, and in any event, there is no ex post facto violation present here because both the 1993 and 2000 editions of the Guidelines contain applicable cross-references to Section 2A3.1. Under the 2000 edition of the Guidelines, Section 2G1.1 is the applicable guideline for convictions under 18 U.S.C. § 2423(a), which prohibits the interstate transport of a minor with the intent to engage in criminal sexual activity. Section 2G1.1 is entitled "Promoting . . . Prohibited Sexual Conduct" and states as follows: "If the [18 U.S.C. § 2423(a)] offense involved criminal sex abuse, attempted criminal sexual abuse, or assault with intent to commit criminal sexual abuse, apply § 2A3.1." U.S.S.G. § 2G1.1(c)(2) (2000) (emphasis added).

Meanwhile, under the 1993 edition of the Guidelines, U.S.S.G. § 2G1.2

argument on appeal is that the district court should have used the 1993 Manual. Thus we address only whether the 1993 Manual should have been used.

25

("Section 2G1.2") is the applicable guideline for convictions under 18 U.S.C. § 2423(a). Just as Section 2G1.1 (2000) does, Section 2G1.2 (1993), entitled "Transportation of a Minor for the Purpose of . . . Prohibited Sexual Conduct," provides that "[i]f the [18 U.S.C. § 2423(a)] offense involved criminal sexual abuse, attempted criminal sexual abuse, or assault with intent to commit criminal sexual abuse, apply § 2A3.1." U.S.S.G. § 2G1.2(c)(2) (1993) (emphasis added).

In other words, contrary to York's argument, under both Section 2G1.1 (2000) and Section 2G1.2 (1993), there are applicable cross-references to Section 2A3.1 if the interstate transport offense involves criminal sexual abuse. Compare U.S.S.G. § 2G1.1(c)(2) (2000) with U.S.S.G. § 2G1.2(c)(2) (1993). While the numbering of the sub-sections (Section 2G1.1 and 2G1.2) is different, the substance of the two provisions is the same for 18 U.S.C. § 2423(a) offenses.[16]

In his reply brief, York essentially concedes that point, but he also argues (1) that the only way to arrive at the same offense level that the district court reached here is "by manipulating the [1993 edition of the] Guidelines," and (2) that "his sentence would have been lower" under the 1993 edition of the Guidelines.

---

[16]There is no Section 2G1.2 in the 2000 edition of the Guidelines. However, in the 2000 edition of the Guidelines, Section 2G1.1 is unquestionably the applicable guideline for convictions under 18 U.S.C. § 2423(a). See U.S.S.G. app. A (2000); see also U.S.S.G. § 2G1.2 historical note (2000) ("Section 2G1.2 . . . was deleted by consolidation with [Section] 2G1.1 effective November 1, 1996.").

26

However, York cites no case or record evidence in support of his argument that his sentence would have been lower if it had been calculated under the 1993 edition of the Guidelines, and as discussed, our own review of the record does not reflect any indication that the district court wished to impose a different sentence. More to the point, because the cross-reference to Section 2A3.1 is essentially identical in both the 1993 and 2000 editions of the Guidelines, the district court did not violate the ex post facto clause by using the 2000 edition.

## IV. CONCLUSION

For all of the above reasons, we affirm York's convictions and sentence.

**AFFIRMED.**