[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 7, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-10704

_____

D. C. Docket No. 06-20518-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN EARL KING, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 7, 2009)

Before HULL, MARCUS and KRAVITCH, Circuit Judges.

HULL, Circuit Judge:

Defendant-appellant John Earl King, Jr., appeals his convictions and 41-month sentences for evading personal income taxes for years 1999, 2001, and 2002. After oral argument and careful record review, we affirm.

## I. Background

To resolve the issues on appeal, we first set forth both the procedural history and the trial evidence.

### A. No Personal Tax Returns for 1998 through 2002

King was the president and majority shareholder of Civil Cadd Engineering, Inc. (Civil Cadd) and the president and sole shareholder of CCE Construction, Inc. (CCEC). King founded both companies.

King filed S-corporation tax returns, known as 1120Ss, with the Internal Revenue Service ("IRS") for Civil Cadd and CCEC each year from 1998 to 2002. Because the S-corporate tax returns passed the corporations' income or loss through to King personally, the returns showed that the corporations owed no taxes for years 1998 to 2002.[1] Barry Hechtman, King's accountant, prepared the corporate returns based on records King provided Hechtman. King signed the returns.

Although King filed S-corporate tax returns for 1998 to 2002, he initially did

---

[1]An S-corporation itself does not pay taxes. Instead, the corporation's income or loss is "passed through" to the shareholders of the corporation. An 1120S return, therefore, is sometimes called an "informational return," as it indicates what income or loss should appear in the shareholders' personal income portion of their 1040 personal tax returns.

not file any personal tax returns for these years. When pressed by Hechtman, King told Hechtman that he had another accountant preparing his personal tax returns, even though at the time Hechtman was King's only accountant. The IRS began investigating King in 2003.

## B.     IRS Investigation in March through April 2004

In March 2004, IRS criminal investigation agents visited King's home to discuss his personal and business tax information. The IRS agents served King with three grand jury subpoenas for the production of his companies' business records. King referred the agents to his attorney, Larry Handfield. The same day the agents interviewed King, other agents simultaneously interviewed King's accountant, Hechtman, and served him with a grand jury subpoena for the production of records used in preparing King's business and personal tax returns. These subpoenaed records were due by April 1, 2004.

## C.     King's First and Second Returns in August 2004

Only after the IRS investigation began did King file personal returns for tax years 1998 to 2002. These returns ("King's first returns") were prepared by Hechtman and filed by King in August 2004.

King's first returns indicated that King owed $88,887 in personal taxes for 1998, $50,218 for 1999, $36,647 for 2000, $29,703 for 2001, and $89,559 for 2002, for a total of $295,014. Hechtman treated both Civil Cadd and CCEC as S-

corporations in preparing King's first returns, passing those corporations' income through to King in his personal capacity. King's first returns for 1998 to 2002 were introduced at trial.

Later in August 2004, King hired Donald Cook, a new accountant, to "start[] from scratch" with King's own records to prepare personal returns for tax years 1998 to 2002 ("King's second returns"). King filed his second returns at various times between 2004 and 2005.[2] King's second returns showed that King owed $50,398 for 1998, $45,165 for 1999, $131,611 for 2000, and $245,916 for 2001, for a total of $473,090. Like Hechtman, Cook treated both Civil Cadd and CCEC as S-corporations in preparing King's second returns, passing those corporations' income through to King in his personal capacity. King's second returns for 1998 to 2001 were introduced at trial. Cook also prepared a second return for year 2002, but it does not appear to be a part of the record at trial.

## D.     Search Warrant in September 2004

On September 1, 2004, after failing to receive the subpoenaed records from King and Hechtman, IRS agents executed a consent search of King's office. The agents seized about 26 boxes of original records. After having those items copied, the agents returned them to King's office on September 15, 2004.

---

[2]The trial record indicates that King filed his second 1998 return on October 15, 2004, his second 1999 return on February 7, 2005, and his second 2000 return on August 12, 2004. The trial record does not indicate when King filed his second returns for years 2001 and 2002.

On February 11, 2005, Leonard Sands, King's other attorney, notified the U.S. Attorney's Office that he represented King. Sands explained that (1) he was "engaging a forensic accountant to assist me sort [sic] through King's financial situation" and (2) King's behavior "[d]uring the period under investigation" did not warrant prosecution.

**E.      March 30, 2005 Conference**

On March 30, 2005, King's two attorneys (Sands and Handfield) and two attorneys from the U.S. Department of Justice Tax Division met at Sands's request. The Tax Division attorneys told King's attorneys that they had recommended that King be prosecuted for tax evasion for the years 1998 to 2002. They also provided a copy of the IRS's computations of King's back taxes. King's attorneys informed the Tax Division attorneys that King had met with several IRS officers "to still try and work the tax situation out."

On April 21, 2005, the Tax Division informed King's attorneys that the Tax Division had authorized prosecution against King and had transmitted the case to the U.S. Attorney's Office.

**F.      2006 Indictment**

On August 24, 2006, a federal grand jury indicted King. Counts I through IV of the indictment (one count for each year from 1999 to 2002) charged King with willfully attempting to evade paying his personal federal income tax for years

1999 through 2002 by (1) failing to make an income tax return on or before the applicable deadlines for those years, (2) failing to pay to the IRS said income tax, and (3) concealing and attempting to conceal his true and correct income through, among other things, paying personal expenses with corporate bank accounts, preparing and causing the preparation of business records that falsely and fraudulently overstated corporate expenses, and filing and causing the preparation and filing of a false and fraudulent U.S. Corporation Income Tax Return for the years 1999 through 2002, in violation of 26 U.S.C. § 7201[3] and 18 U.S.C. § 2. Counts V through VII of the indictment (one count for each year from 1999 to 2001) charged King with filing false returns by willfully representing on his U.S. Corporation Income Tax Returns for calendar years 1999 through 2001 an annual income for Civil Cadd that was substantially less than the amount he knew Civil Cadd to have earned, in violation of 26 U.S.C. § 7206(1).

On September 5, 2006, King pled not guilty. On September 6, the district court set King's jury trial to start 40 days later on October 16, 2006. Also on September 6, the district court issued a standing discovery order requiring the

---

[3]26 U.S.C. § 7201 provides:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

government to permit King to inspect and copy all discovery materials in its possession within 14 days.

**G.    SDO Response**

On September 18, 2006, the government filed a response to the standing discovery order ("SDO Response"). The SDO Response explained that copies of the documents that the government intended to use at trial were placed on file at Xpedia Copy Service. Because King claims on appeal that he did not have adequate time to copy and review these documents, we outline what those documents were.

Paragraph 5 of the government's SDO Response advises generally what documents were at Xpedia as follows:

> Copies of books, papers, documents, photographs, tangible objects, and other items of "real" evidence not already returned to the defendant which the government intends to use as evidence at trial to prove its case in chief, or were obtained or belonging to the defendant have been placed on file with Xpedia Copy Service . . . . A detailed listing of the contents of the fifteen bankers boxes of materials on file with Xpedia is attached to this response as Atch C. Additionally, an eleven page listing of items originally seized via search warrant from Civil Cadd's office is also attached to this response as Atch D. With respect to this eleven page list, copies of these materials are NOT on file with Xpedia. All of the original materials were returned to the defendant by the IRS. They are already in his (and his company's) possession. Copies of those documents were retained by the IRS. Please advise the undersigned if you deem it necessary to review those copies.

Because there were 15 boxes worth of materials, Attachment C to the SDO

Response identified them by box number with a description of the contents and bates numbers.[4] It appears that at least 29,000 documents were in the boxes referenced in Attachment C. Sands obtained a cost estimate from Xpedia for copying which refers to 29,000 documents and calls it the "1st Part of Production."

Attachment D to the SDO Response identified the documents that the government seized from Civil Cadd's office in the September 2004 search. Attachment D described those documents by the location where they were found in Civil Cadd's office, the evidence box in which they were stored, and the type of documents in each box.[5] The SDO Response noted that the documents in Attachment D were not on file with Xpedia, but they in fact were. Sands also obtained a separate, second cost estimate that refers to 50,000 documents in "26 boxes" and calls it the "2nd Part of Production." Although the government had returned the originals to King in 2004, the government placed its copies on file

---

[4]For example, Attachment C indicated that boxes 1-7 contained 17,633 documents identified as bank statements, signature cards, credit cards, deposit items, and cancelled checks from King's 19 different checking accounts and specified which account number was in each specific box. Each box was listed separately with descriptions, such as: box 3 contained the Colonial Bank account # 8022079241 bank statements, signature cards, deposit items, and cancelled checks, which were bates stamped numbers 4489-7055; box 10 contained the Civil Cadd 1120S tax forms and general ledgers from 1999-2001, which were bates stamped numbers 22,229-23,306 and 22,548-22,648 for the tax forms and 22,307-22,468 for the ledgers. The first 13 boxes alone listed over 28,500 documents, each page bates stamped.

[5]For example, Attachment D indicated that box 21 was seized from Cabinet 1 in King's Conference Room and contained Payroll Records and Quarterly Reports from July 1999 to December 2000. Box 17 was seized from on top of the file cabinet in King's Conference Room and contained the binder for Project # 104.022, entitled "Two Guys Restaurant 1135 NW 3rd Avenue."

with Xpedia.[6]

## H. King's First Continuance Motion

On September 29, 2006, King filed both an unopposed motion to continue the trial date until May or June 2007 and an unopposed motion for additional time to file defense motions. King stressed that this was a paper-intensive criminal tax case under investigation for four years and Xpedia was holding 39 boxes totaling 80,000 documents as discovery. Moreover, King wanted one or more forensic accountants to review and analyze the records. The review would take "several months at the very least." On October 4, 2006, the district court summarily denied both motions.

## I. The October 10, 2006 Exhibit List

On October 10, 2006, the government faxed King its trial exhibit list that identified 170 documents (which comprised nearly all of the government's exhibits at trial) and a draft proposed stipulation for King's business records. The October 10 Exhibit List identified each exhibit by its description and by the witness that would introduce each exhibit. For example, the list described Exhibit 173, which corresponded with witness Donald Cook, as "Civil Cadd 1999 financial statements,

---

[6]On November 20, 2006, the government filed an affidavit from the IRS-Criminal Investigation agent assigned to King. The agent's affidavit indicated that (1) the September 1, 2004, search of King's office resulted in the seizure of 26 boxes of material and (2) two weeks later, the original 26 boxes were returned to King. After King was indicted and arraigned, the agent delivered the discovery items to Xpedia. The agent's affidavit states: "A major portion of the discovery materials . . . placed on file with Xpedia were in fact the 26 boxes of copies of King's office records," the originals of which already were returned to King in September 2004.

9

1120S for 1999 Civil Cadd, 1120S for 1999 CCEC, and King 1999 1040 Tax return." Similarly, the list described Exhibit 102 as "2002 Blais Cycle invoices" and stated that this exhibit would be presented through Kevin Blais, the owner of Blais Cycle, Inc. The government delivered copies of each marked trial exhibit to King's attorney on October 13, 2006.

## J.    King's Second Continuance Motion

On October 11, 2006, King renewed his motion to continue the October 16 trial and waived his speedy trial rights. Because there were only six weeks between indictment and trial and only four weeks between the government's September 18 discovery response and the October 16 trial, King argued that preparing a complex case was not possible, regardless of the capabilities and diligence of counsel. King reiterated that he had "not received—let alone reviewed—the enormous volume of discovery in [the] case." King's October 11 motion also noted that his counsel had scheduling conflicts. The district court granted King a trial continuance until October 24, 2006.

On October 17, 2006, King supplemented his two unopposed motions to continue the trial. King asserted that the indictment failed to allege the exact amounts of unreported income and the taxes owed. King noted that he received the government's discovery response on September 19. As of October 17, only 28,901 documents (out of 80,000) had been copied. King stated that he needed 10 to 14

more days to copy the remaining 26 boxes of material.[7]  Additionally, King noted

that he had received copies of the government's 170 trial exhibits just four days

ago.  King's forensic accountant had not had time to review and digest the

discovery, and therefore could not determine which of the 80,000 documents

would be of value to the defense.  Finally, King argued that the time taken by the

government to investigate the case should not be charged to him, regardless of

whether King knew the government was considering criminal charges.

The district court again denied King's motions, finding that "[o]n September

6, 2006, this case was set on the October 16, 2006, trial docket, allowing a full 40

days (or more than 5 weeks of preparation time), to engage in discovery, file pre-

trial motions and otherwise conduct those matters set forth in Defendant's motion

for continuance."  In an apparent reference to the materials seized from, and

returned to, King's office two years earlier in September 2004, the court noted that

much of the documentary evidence the government relied on had been returned to

King.  It found that King had "ample time to examine and review the remaining

evidence."

K.    The October 23, 2006 Revised Exhibit List

On October 23, 2006, the day before trial, the government provided King

---

[7]As of October 17, 2006, King had copied the (approximately 29,000) documents in Attachment C to the SDO Response but had not copied the 26 boxes itemized in Attachment D. However, it is noteworthy that the documents in these 26 boxes represented copies of the documents obtained in the search of King's office, the originals of which were returned to him in 2004.

with a revised trial exhibit list and attached copies of all of the prospective government exhibits (other than transcripts of grand jury testimony of prospective witnesses that the government did not anticipate offering into evidence). The government's accompanying cover letter explained that the revisions to the list were revisions of form—not substance. The cover letter stated that the "vast majority" of marked exhibits were copies of exhibits already provided with the October 10 Exhibit List. A review of the two exhibit lists shows that the government added approximately 25 exhibits (including summary charts and photos of vehicles) and substituted approximately 10 exhibits.

## L.    Trial

King's trial commenced on October 24, 2006, and lasted until November 1, 2006. At the start of the trial, King's counsel moved for a continuance, explaining, "I have never felt so inadequate and unprepared for a major case like I do . . . . For all practical purposes we have had about a month to get ready . . . . [T]his case was under investigation for a long time, but we had reason to believe that the case had gone away." He further stated, "These cases ordinarily take eight months to a year to get worked up, not 30 to 40 days. . . ." The court orally denied the motion.

In its case-in-chief, the government called approximately 30 witnesses and introduced approximately 170 exhibits. These witnesses included: accountant Hechtman, who prepared King's first returns; accountant Cook, who prepared

King's second returns; and Joan Leavitt, an IRS forensic accountant.[8]

Hechtman, who prepared King's corporate tax returns from 1998 to 2002, testified that King failed to file any personal income tax returns from 1998 to 2002. Hechtman did not prepare or file any personal income tax returns on King's behalf from 1998 to 2002 because King told him that "he had another accountant doing his personal tax returns." Hechtman stated that, in August 2004, after he and King's office manager were subpoenaed to testify before a federal grand jury, King asked Hechtman to file King's first returns for 1998 to 2002.

Hechtman used financial statements and ledgers provided by King to construct these personal tax returns. King ultimately reviewed and approved all of Hechtman's entries before filing the returns. As noted earlier, King's first returns for 1998 through 2002 showed King owed $295,014. Hechtman testified that when the IRS started the investigation, King "decided to make changes to [his previously filed S-corporate] tax returns" and asked Hechtman to file his personal returns for 1998 through 2002. Hechtman also testified that, despite being warned by Hechtman of the impropriety of such activities, King commingled personal and business funds, labeled certain business assets and activities deceptively, and

---

[8]Other witnesses included motorcycle shop owners and comptrollers, car dealership salesmen and comptrollers, mortgage company team leaders, bank vice presidents and records custodians, consulting firm vice presidents and presidents, IRS criminal investigators, a chief financial officer, a pastor, and an IRS revenue officer.

underreported his businesses' income.[9]

The government also called Cook, King's accountant, who detailed each entry in King's second returns. Cook stated that he used "check stubs[,] . . . bank statements[,] and cancelled checks" to compile the second returns. King's second returns for 1998 through 2001 showed King owed $473,090. Cook reaffirmed that his calculations were accurate and that he asked King to review them before filing.

After Cook described King's second returns figure-by-figure, he explained that King had not actually filed any individual tax returns from 1998 to 2002 because "he just hadn't gotten around to it." When Cook showed King that he owed hundreds of thousands of dollars in taxes, King did not appear surprised. Cook "assumed [King] knew how much money he was making, so [Cook] assumed he knew how much tax liability he had." The government attorney asked Cook about the motorcycle purchases. Cook stated that he charged those expenses to King personally rather than to King's businesses.

During cross-examination by Sands, Cook explained that King was not worried about not having filed tax returns for 1998 to 2002 because "he had done it

---

[9]Hechtman also summarized the distinction between an S-corporation, "where all the profit or loss is passed through to the individual so the corporation itself does not pay any tax," and a C-corporation, which "pay[s] [its] own tax, and the income and loss is not passed through the shareholder." The income received by an S-corporation is added to the personal income of the personal tax returns of the shareholders of the corporation.

before and he didn't see what the big deal [was]." Cook also explained that King had told him that both Civil Cadd and CCEC were S-corporations. As noted earlier, King's first and second returns treated both companies as S-corporations.

Leavitt, the IRS accountant, also testified about her detailed examination of King's financial records. Leavitt testified that King's inappropriate corporate ledger entries reduced Civil Cadd's ordinary income, and thereby reduced King's personal income that passed through Civil Cadd to him. She described several other inappropriate practices of King, such as: depositing payments from Civil Cadd customers into his personal accounts; having company checks written to an employee and demanding the employee immediately provide the cash back to King for his personal use; and commingling personal and corporate funds. Leavitt detected in King's bank records what appeared to be "structured transactions": attempts to evade currency transaction reports by cashing checks in the amount of $9,500 on a consecutive series of days. King's lawyer also cross-examined Leavitt about the subchapter S/C issue and then noted that, according to King's second returns, King had "self-reported" a greater tax liability for the tax years in question than Leavitt had calculated.

After the government rested, King moved for a mistrial, asserting that he had been denied the necessary processes of obtaining discovery, having an accountant review the discovery materials, and meeting with the government attorney to focus

the issues and ask questions. King argued that the absence of these processes limited his ability to examine the government's experts. The court denied King's motion.

King then called two witnesses who focused on King's lack of sophistication in accounting and economic matters. Of the 1,553 page transcript from the jury trial, 58 pages consist of King presenting his case.

The jury found King (1) guilty on three counts—the evasion of personal taxes for years 1999, 2001, and 2002 and (2) not guilty on four counts—the evasion of personal taxes for year 2000 and the filing of false corporate tax returns for years 1999 through 2001.

## M. Post-Trial Motions

Following the verdict, King renewed his motion for judgment of acquittal and/or for a new trial. King argued that his counsel had insufficient time to prepare for trial in light of the volume of discovery, and that he was effectively denied the services of a forensic accountant due to the limited time between his August 24 indictment and October 24 trial.

The government's response argued that King was unable to meet his burden of establishing that he suffered "specific, substantial prejudice" because of the court's continuance denials. The government pointed out that since March 2005, King was aware that he failed to pay his taxes during the relevant tax years, knew

16

how much he owed, and was aware of the IRS's computations of King's tax liabilities. According to the government, King had no plausible basis for claiming that a forensic accountant could impeach the IRS's computations or the evidence underlying the government's case. In addition to the IRS's computations, King's amended tax returns prepared in 2004 (i.e., King's second returns) showed gross underpayments and established tax deficiencies greater than those calculated by the government.

The government attached several exhibits to its response. For example, the government attached a memorandum from the March 30, 2005 conference between the Tax Division and King's attorneys.[10] The memorandum stated that King's attorneys were informed that "the purpose of the conference [was] to provide the taxpayer with the opportunity to present explanations and evidence through his representatives that might assist the Government in reaching a decision regarding prosecution." The IRS recommended that King be prosecuted for evading taxes for the years 1998 through 2002. King's attorneys were informed that the IRS used the specific items method of proof. They were provided with a copy of the IRS's computations of King's tax deficiencies.

The government also attached: (1) an April 21, 2005, letter from the Justice

_____

[10]Also attached was a February 11, 2005, letter from King's attorney to the U.S. Attorney regarding the grand jury investigation, stating that King should not be considered for criminal prosecution. King's attorney requested a conference before any prosecution decision was made.

17

Department's Tax Division to King's attorneys that notified them of its decision to authorize prosecution against King; (2) an October 10, 2006, fax from the U.S. Department of Justice that provided King's attorneys with the government trial exhibit list; and (3) an October 23, 2006, letter stating that the government had enclosed a complete copy set of its trial exhibits and a copy of its revised exhibit list.

The district court denied King's motion for a judgment of acquittal and/or a new trial. King filed a motion for reconsideration, which the court also denied.

## N. Presentence Investigation Report

According to the presentence investigation report ("PSI"), King received substantial income between 1998 and 2002, but failed to timely file personal income tax returns or to pay income tax to the IRS for those years. The PSI indicated that King's personal income "tax due and owing" was $562,649, consisting of: (1) $50,398 for 1998; (2) $45,165 for 1999; (3) $131,611 for 2000; (4) $245,916 for 2001; and (5) $89,559 for 2002.[11] Because the loss amount was greater than $400,000 but not more than $1,000,000, the PSI calculated King's base offense level as 20 under U.S.S.G. § 2T1.1(a)(1) and § 2T4.1 (Tax Table). A 2-level enhancement applied under § 2T1.1(b)(2) because the offense involved

_____

[11]The PSI used King's second returns to arrive at the totals due for years 1998 to 2001. King's second 2002 return was not a part of the record at trial, and the PSI used the total due from King's first returns for 2002.

sophisticated means, yielding a total offense level of 22. Based on King's offense level of 22 and criminal history I, his advisory guideline range was 41 to 51 months' imprisonment.

The PSI also detailed some of King's conduct. For example, the PSI stated that King used Civil Cadd funds to pay for his personal expenses and that he claimed these personal expenses as Civil Cadd business expenses. King deposited Civil Cadd checks and transferred Civil Cadd funds into his personal account. He diverted Civil Cadd's receipts into his personal accounts and did not report these monies as Civil Cadd income. According to the PSI, King made payments from Civil Cadd's bank account to his mortgage company and to Blais Cycle, Cycle Race Tek, Inc., and Motoport USA, Inc., for the purchase and repair of motorcycles and automobiles. King also made payments from Civil Cadd's account to Morningstar Jewelers and Pawn Brokers, Pools by Andrew, and Ed Morse Cadillac of Pembroke.

The PSI found that because King deposited Civil Cadd's and CCEC's funds into his personal account without notifying his accountant, the funds were not included as King's ordinary income. King also caused his accountant to prepare false tax returns by not including as income numerous checks from Civil Cadd clients totaling $196,729.10.

King, still acting through his trial counsel Sands, filed objections to the PSI.

First, King claimed that the PSI should have used the Tax Table in the 1998 Sentencing Guidelines manual and not the 2001 amended Tax Table in the 2006 manual. Second, King objected to the enhancement for sophisticated means, arguing that he personally never made a single accounting entry and that trial witnesses testified about his lack of sophistication as to accounting and taxes. Third, King objected to the amount of tax loss attributed to him. King asserted that the PSI improperly included the tax loss for 1998, a year that was beyond the statute of limitations and for which King was not prosecuted, and for 2000, a year for which the jury found him not guilty of tax evasion. Excluding 1998 and 2000, his total tax loss (for 1999, 2000, and 2002) was less than or equal to $380,640.

Fourth, King's objections argued that the short amount of time provided to review King's tax situation "made any attempt to go behind the government's computations virtually impossible except in the most superficial of ways." King attached to his PSI objections a January 2, 2007 letter from Russell Dunn, his third accountant. Dunn's letter indicated that he began discussing the government's calculations of King's tax underpayments in late August or early September 2006. Dunn noted that he had visited Xpedia with Sands on October 17, 2006, and that, in light of "the approximately seventy-four thousand (74,000) pages of paper," he "would need a minimum of six to nine months to fully examine all of the documents and make a determination as to the propriety of the government's

20

claims against Mr. King."[12]

Although Dunn's letter pointed out some "potential problems" with the IRS's computations, his letter also stated: "I cannot give my opinion of the propriety of the government's adjustments to net income at this time." For example, as to the 1999 tax year, Dunn's letter noted that there "appears to be an inconsistency in the government's computation." Dunn's letter asserted that the government made a reduction in King's shareholder loan account in Civil Cadd for 1999 without making a corresponding reduction in King's income for 1999. Dunn's letter, however, admitted that he "ha[d] not had the opportunity to determine the propriety of the government's proposed adjustment to loans from shareholder [King] due to time constraints."

Similarly, Dunn's letter acknowledged that King's first and second returns in 2004 showed tax underpayment totaling $562,649 for tax years 1998 to 2002, as stated in the PSI. Dunn's letter noted that, subsequent to the filing of those returns, "the IRS notified Mr. King that CCE[C] was not an S-corporation." Dunn's letter estimated that the effect of removing CCEC's income from King's personal income would reduce King's personal income taxes for 1999 to 2001 by $149,265 and that King would owe $362,986 instead of $562,649.

Beyond that reduction, Dunn's letter stated "it has come to my attention that

---

[12]As mentioned later, King had worked with Dunn as early as January 2006 with regard to the payroll taxes of King's companies.

21

Donald Cook has prepared amended tax returns for the corporate entities as well as John King's 1040s for 2000, 2001, and 2002. These amended 1040s indicate that John King does not have any tax due and owing." At some point in 2006, Cook apparently prepared a third set of personal tax returns for King. However, there is no indication that King's third returns were introduced at trial in 2006 or even at the sentencing hearing in 2007. Moreover, Dunn's letter continues that "[he] ha[d] not had an opportunity to examine the tax returns, interview Mr. Cook, nor examine the underlying supporting documentation to determine the validity of [King's third] returns."[13]

Dunn's letter concluded that "additional time [was] necessary to form [his] opinion regarding Mr. King's tax liabilities. There are too many conflicts at this time between the government's analysis of his tax obligation and those of Mr. King's current and former accountants. The substantially correct amount of tax is currently an elusive concept."

## O. Sentencing Hearing

At the sentencing hearing on January 30, 2007, King, for the first time acting through his current attorney, Roderick Vareen, renewed his objection to the court's denial of his continuance motions. King again listed the reasons for his objection, including his counsel's unpreparedness to cross-examine witnesses, as "they did

---

[13]Further, at the time of trial, neither of King's counsel appears aware King's third returns existed or were in the process of being prepared.

not have the evidence that the government had beforehand."

King also noted that the government's opening statement at trial referenced King's use of corporate assets to purchase motorcycles. However, since trial, King had provided counsel with documents showing that "loans [] he took out through Colonial Bank [] show that he collateralized a 1962 Chevrolet Corvette in order to get substantial dollars to purchase motorcycles." That information did not come out at trial, however, because:

> [T]his was something that was buried in files that the defense were not aware that they were going to have to challenge at that time . . . . [T]hey could not meet the challenge that the government put forth in its evidence with regard to the five hundred some odd documents that were not spelled out essentially until the time of trial that they had to meet.

Further, King asserted that it was not possible for his counsel to go through the 39 boxes of discovery material without help, and Dunn did not have sufficient time "even to address the issues spelled out in the PSI."

The government replied that because King and his counsel were involved with the IRS in 2005 and 2006 regarding payroll tax issues, King's attorneys "were given complete information regarding what the IRS [was] investigating criminally. To say they were caught by surprise in this case is simply not credible." King responded that the government informed him that, if he was going to be indicted, it would occur in March of 2006. When that did not occur, he "didn't have any reason to believe . . . that an indictment was still being sought for Mr. King's arrest

on these charges."

The district court allowed King and the government to present witnesses about the continuance issue for the record on appeal. The government presented Lashell Williams, a revenue officer with the IRS. Williams collects delinquent income and employment taxes. Williams testified that the Civil Cadd collection was assigned to her in November 2006 but that IRS agents were in contact with Sands, King's attorney, beginning in October 2005 and with Dunn, King's accountant, beginning in January 2006.[14]

King presented no witnesses at sentencing. Instead, Sands spoke briefly about King's involvement with the IRS. Sands argued that it was unfair to consider King's initial meeting with the IRS in 2005 a "meeting" because it occurred two years before the indictment and because King "did not know specifics" and "did not have books and records." Sands claimed that all "[the IRS] will tell you in those meetings and they are very careful not to disclose too much of their case is what they believe the prosecution years are, what the method of prosecution is going to be." Sands concluded by stating that because "[t]here was such a long hiatus [between this first meeting and King's indictment,] . . . we had foolishly convinced ourselves there was no case."

---

[14]According to Williams, Dunn contacted her predecessor at the IRS on January 6, 2006, "with respect to a payroll matter but he indicated he was appearing as power of attorney on behalf of Mr. King."

24

Also at sentencing, King renewed his objections to the PSI. Sands argued that the court should not rely on the 2006 Sentencing Guidelines manual because King's criminal conduct occurred from 1999 through 2001, the applicable Tax Tables changed in 2001, and the 2006 manual applied the 2001 Tax Table amendment, which punished King more stringently, thereby violating the Ex Post Facto clause. The court overruled King's objections, noting that he was convicted for the personal tax return due in 2002, the year after the applicable Tax Table was amended in 2001.

King next objected to the amount of loss and use of the Tax Table, arguing that Counts I, III, and IV did not specify a tax loss amount for which King was responsible, and thus the jury did not decide the tax loss amount. King argued that the court should apply a base offense level of six, under U.S.S.G. § 2T4.1(b), and not enhance his offense level based on a tax loss amount of over $400,000. The court found that, regardless of the jury's verdict, it could include uncharged and acquitted conduct if it was satisfied that a preponderance of the evidence supported the PSI's calculations of the probation officer. The court noted that the PSI reflected tax liabilities of $562,649, "s[o] just on the basis of the returns which essentially [King] filed himself, he has established he is in excess of the $400,000 base by $162,649." The court overruled King's objection, finding that a preponderance of the evidence showed the amount of taxes due exceeded

$400,000.

Next, King objected to the two-level enhancement for sophisticated means. He argued that, at most, the government showed he commingled his personal and corporate funds. King did not create a fictitious corporation, maintain offshore accounts, reroute money, or create fictitious employees. Essentially, the government accused him of bad bookkeeping. The court overruled the objection, finding that King had "used his company's shareholder loan account to conceal income or to hide income," classified vendor checks as loans, classified personal expenses as corporate expenses, and had an employee cash business checks and provide him personally with cash.

The court adopted the PSI calculations and sentenced King to a term of 41 months' imprisonment on each of the three counts of conviction, to run concurrently, followed by three years of supervised release, and a fine of $10,000.

## II. Continuance Motions

We first address King's claim that the district court abused its discretion by denying his motions for continuance.

## A. Circuit Precedents

"The Sixth and Fourteenth Amendment to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and

26

punished by imprisonment." United States v. Verderame, 51 F.3d 249, 251 (11th Cir. 1995). "Implicit in th[e] right to counsel is the notion of adequate time for counsel to prepare the defense . . . ." Id. at 252. Whether a denial of a continuance motion amounts to a violation of due process depends on the circumstances of the particular case. Id. at 251 (stating that "[t]here are no mechanical tests" for making the determination (quotation marks omitted)). "To prevail on such a claim, a defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice." Id.

We have applied these principles on several occasions. United States v. Valladares, 544 F.3d 1257, 1265 (11th Cir. 2008); Verderame, 51 F.3d 249; United States v. Gossett, 877 F.2d 901 (11th Cir. 1989). We review each case.

In Gossett, we concluded that the defendants failed to show the "specific, substantial prejudice" required to obtain relief. 877 F.2d at 906. Both defendants were convicted of murdering a ship's captain, attempted murder of his first mate, and mutiny. Id. at 903. The original six-count indictment was returned on August 28, 1987, and the trial was set for November 9. Id. at 905. On October 29, the grand jury returned a superceding indictment, which dropped two of the original charges and added a felony murder charge. Id. Upon the government and defendants' joint motion, the district court granted a continuance until November 23. The issue was whether the court abused its discretion in not granting the extra

seven days until November 30 as requested by the parties. Id. at 906.

The defendants in Gossett claimed that, "due to the changes in the superceding indictment," they "had inadequate time to prepare for trial." Id. at 906. In concluding that defendants failed to show "specific, substantial prejudice," this Court stated that the defendants "suggested nothing to this Court, nor can we find anything in the record that would indicate the possibility of a different outcome if the defendants had been given an additional seven days to prepare for trial." Id.

In Verderame, however, we concluded that the district court abused its discretion in repeatedly denying Verderame's unopposed motions for a continuance. 51 F.3d at 250. The government charged Verderame with participation in two separate conspiracies to import and distribute cocaine and marijuana and with criminal forfeiture. Id. On May 13, Verderame filed an unopposed motion for a continuance of his June 3 trial,[15] which the court denied. Id. On May 26, the government filed a bill of particulars listing for the first time the items subject to forfeiture (including Verderame's home, business, liquor license, and other personal property items). Id. Verderame filed two more continuance motions, arguing his counsel had inadequate time to prepare a defense and had not received copies of all relevant documents. Id. at 250-51. On June 3,

---

[15]A magistrate judge set Verderame's trial for July 1, 1993. Verderame, 51 F.3d at 250. At the May 4 arraignment, the district court advanced his trial date to June 3. Id.

the district court denied the motions. Id. at 251. The government then dismissed the cocaine conspiracy charge, but on the first day of trial (June 7) filed a second bill of particulars adding $2.4 million in cash to the list of forfeitable property. Id. At trial, "[t]he bulk of the evidence which the government presented against Verderame consisted of the testimony of an internal revenue agent who had analyzed Verderame's financial records." Id. The analyst testified that Verderame spent more between 1988 and 1992 than he listed as income on his tax returns for those years, indicating Verderame derived income from illegal activities. Id.

In reversing Verderame's conviction, we concluded that the 34 days between arraignment and trial failed to provide ample time to defend against "a case which the government spent years investigating, . . . which grew during the 34-day interval to encompass further property subject to forfeiture, . . . which abruptly shifted focus away from the cocaine conspiracy a mere four days before trial." Id. at 252. We also noted that the 34 days did not provide the government sufficient time to supply Verderame with the documents it had seized and to which he was entitled. Id.

Finally, in Valladares, we concluded that the district court did not abuse its discretion in denying the defendant's unopposed motions to continue her trial because Valladares failed to show that "specific, substantial prejudice" resulted from those denials. 544 F.3d at 1265. Indicted for participating in a Medicare

29

fraud scheme, Valladares had 34 days between her arraignment and trial to plan her defense. Id. at 1261, 1264.[16]  Because "Valladares ha[d] not pointed to any specific documents or relevant, non-cumulative evidence she would have presented, nor ha[d] we found anything in the record that would indicate a different result had the motions been granted," we affirmed Valladares's three convictions. Id. at 1264 (quotation marks omitted).  We distinguished a case like this from Verderame, "where the government's case was based primarily on an IRS agent's testimony about the defendant's financial records and defense counsel argued that there were specific financial records that he needed to refute the agent's testimony but did not have time to obtain and review before the trial began."  Id.  We also noted that, "in light of the extensive testimony by the pharmacy owners and two Medicare beneficiaries implicating Valladares in the Medicare fraud scheme, it is unlikely that presentation of these records [the government delayed producing or had not produced] would have changed the outcome of her case."  Id.[17]

---

[16]According to the government, Valladares would pay Medicare beneficiaries to visit doctors, whom she also bribed, to obtain prescriptions for unnecessary medications.  Valladares, 544 F.3d at 1261.  Valladares then gave these prescriptions to pharmacies in exchange for kickbacks, and the pharmacies used them to submit fraudulent reimbursement claims to Medicare.  Id.  Although it was not charged in the indictment, the government also presented evidence that Valladares independently submitted fraudulent Medicare claims on behalf of her company, PRN Home Health Care ("PRN").  Id. at 1261.

[17]Valladares had argued prejudice in that (1) PRN did not file claims on behalf of certain Medicare beneficiaries that the government attributed to her in the pharmacy scheme, (2) the government delayed in making billing records available to her that "would have assisted the defense to demonstrate a lack of association between many [of those Medicare beneficiaries] and Mrs. Valladares," and (3) the government failed to turn over Medicare "Explanation of Benefits" forms for the PRN claims from 2000 through 2007, which "clearly were relevant to the defense."

## B.    King's Continuance Motions

Here, 61 days separated King's indictment (August 24) and trial (October 24) in this relatively complicated tax evasion case.  King's counsel moved for a continuance on three different occasions, each time explaining why he could not be prepared for the impending trial.  The court granted King only an eight-day continuance (from October 16 until October 24) and denied his other requests.  At the start of trial, King's counsel orally renewed his continuance motion, which the court also denied.

The difficulty in trial preparation was exacerbated by the fact that, little more than a month before trial, the government left 39 boxes containing 80,000 discovery documents at Xpedia, a copy center.  Although the government gave King its list of 170 exhibits two weeks before trial and copies of each exhibit 11 days before trial, King did not receive the revised exhibit list until the day before trial.  Admittedly, the majority of the documents at Xpedia were copies of King's own documents and were itemized in the government's Attachments C and D.  Nonetheless, this is a complicated tax fraud case involving voluminous records.  King's request for more time to prepare was reasonable.  While we understand the need to move cases expeditiously, this case was not a simple one.  A 30- or 60-day continuance, for example, would not have unduly delayed the court's docket under

---

Id. at 1264 (quotation marks omitted) (alteration in original).

these facts.

The problem for King, however, is that he has not shown that the district court's denials resulted in "specific, substantial prejudice" to his defense, as required by our precedents. King's brief argues generally that he did not have sufficient time to fully develop a defense to the charges, to find and prepare his own witnesses, to effectively cross-examine the government's witnesses, or to rebut the government's case. King also claims that Dunn, his forensic accountant, did not have adequate time to review the government's calculations and exhibits.

However, King has not identified what new, specific information he would have presented to the jury with more preparation time, much less how that new information possibly would have affected the outcome in his case. Simply put, King's claims are primarily general allegations of a lack of time to prepare unaccompanied by a description of how more time would have changed the end result. King fails to name a single new witness, other than Dunn, he would have called if given more time to prepare. And, two years later, he does not point to a single question he would ask differently on cross-examination. Indeed, Dunn, his third accountant, admits in his January 2, 2007, letter that he cannot give any opinions about the amount of taxes owed by King. In fact, a total of five months elapsed from the indictment in August 24, 2006, until the sentencing on January 30, 2007, yet King still did not have an accountant develop any new information

32

that would support a possibility of a different result. King has no accountant or evidence that would impeach his own two filed and signed tax returns, much less the government's calculations of his tax liabilities. At a minimum, King could have had an accountant in that five-month period take one of the tax years and prepare a computation of what King contends he actually owed. He never did.

The closest King gets to specifics are his allegations that he discovered post-trial (1) that CCEC is a C-corporation (and not an S-corporation) and (2) loan documents for some of his motorcycle purchases. Neither allegation helps King. First, at trial, both King's lawyer (Sands) and King's accountant (Cook) acknowledged knowing about the question regarding the corporate status of CCEC. Sands's cross-examinations of Hechtman, Cook, and Leavitt at trial indicate that King was aware of, and had the opportunity to fully cross-examine witnesses about, the subchapter S/C-corporation issue during trial.[18] All knew that the

---

[18]For example, this exchange between Sands and Leavitt took place at trial:

Q      Now, you know that Civil CADD was an S-corporation, correct?
A      Yes.
Q      That CCE[C] was a C-corporation?
A      Yes.
Q      Wouldn't it have made better sense if both of them had been S-corporations?
A      Yes.
Q      At least that is what you would expect.
A      Certainly.
Q      It was not in the taxpayer's interest to have an S-corporation and a C-corporation?
A      No, they were filed together, and we have already discussed, but –
      . . .
Q      But it really is not advantageous to the taxpayer, and we can forget about this case, okay, but just in general, it's not advantageous to operate two

33

government's calculations, and even King's first and second returns, treated CCEC as an S-corporation that passed its income through to King. King's ignorance of CCEC's corporate status—an entity that he owns—cannot be blamed on the lack of time to prepare for trial.[19] Moreover, even if the income from CCEC was not passed through to King, Dunn's calculations, eliminating that pass through, show that King still owed $362,986 in personal taxes.[20]

businesses that are somehow related, and one is an S-corporation and the other one is a C-corporation?

A  Yes, sir, in general, that would be correct.

Q  Because you are going to wind up paying taxes twice on the C-corporation.

A  The C-corporation would have double-taxation, yes, if the dividends would be given to the shareholders, yes.

. . .

Q  And the reason why a small businessman would not want to have a C-corporation is because he is going to run into this problem of having double taxation?

A  In general an S-corporation is going to be more advantageous for a small business.

Q  And that's why you do it. You would expect to see –

A  As a limited-liability company, yes.

Q  Which is the same idea that there would be taxation once to the owners?

A  Right.

Q  Especially when you have two companies that are related and that you more or less have the same ownership, it makes no sense that one should be a C-corporation and the other one should be an S-corporation?

A  Yes, sir, I would agree with that.

Q  And certainly Barry Hechtman would have known the difference, or he should have known the difference?

A  I am sure that he knows the difference between the C-corporation and an S-corporation, yes.

[19] According to his corporate tax returns, King's Civil Cadd and CCEC did not pay taxes on income but as S-corporations passed that income through to King. This may explain why the jury convicted King on the personal income tax charges but acquitted him on the corporate tax charges.

[20] As noted earlier, Dunn's letter mentions that Cook prepared King's third returns showing King had no personal taxes due for 2000, 2001, and 2002. It is unclear from Dunn's

In any event, at sentencing, the district court rejected the argument that CCEC should be treated as a C-corporation, not an S-corporation, and that King owed less or no taxes. King's own accountants, Hechtman and Cook, had prepared King's first and second returns, both treating CCEC as an S-corporation. Further, each return shows that King owed substantial personal taxes ($295,014 according to King's first returns and $473,000 according to King's second returns). Given that the jury also had King's first and second returns in evidence, King has not shown a possibility of a different result as to his convictions for the evasion of personal income taxes.

As to the motorcycle purchases, King was on actual notice that the government was going to rely on specific motorcycle purchase records. The October 10 Exhibit List, served on King's attorneys, specifically informed King that company checks that he used to pay for personal motorcycle purchases (Civil Cadd checks to Blais Cycles, Motoport USA, and Cycle Race Tek), as well as copies of the invoices he had been issued from Blais Cycle, Cycle Race Tek, and Motoport USA, would be introduced at trial. These checks supplemented the government's earlier disclosure of the copies of King's Wachovia Bank and Colonial Bank records in its SDO Response. The government's draft of proposed stipulations also specifically refers to the records of the motorcycle purchases as

letter when in 2006 Cook allegedly did this. In any event, those purported new, third tax returns were not introduced at the sentencing hearing on January 30, 2007.

government trial exhibits. The government delivered copies of each marked exhibit to King's attorney on October 13, 2006. King had time before the October 24 trial date to investigate this discrete set of his records. In any event, King's motorcycle purchases were but a single example of King's large-scale financial manipulations designed to hide his personal income, as established at trial.

This leads us to the final point. The trial evidence overwhelmingly showed that King had evaded paying personal income taxes in 1999, 2001, and 2002. King falsely told his original accountant Hechtman that another accountant was filing his returns for 1999 through 2002 and that Hechtman need not prepare them. Only after the IRS began its investigation and searched his office did King have Hechtman and his second accountant, Cook, prepare returns in 2004. Those two sets of returns both showed that King owed substantial personal income taxes for each of the years he was convicted. There was ample evidence that, inter alia, King (1) used Civil Cadd funds to pay the mortgage on his personal residence throughout 1998 to 2002 and to pay for the construction of a swimming pool at his residence, but booked those payments as Civil Cadd expenses or debts, (2) repeatedly commingled his personal and business funds, (3) channeled transactions through the Civil Cadd account that should have been handled as personal finances, and (4) paid himself hundreds of thousands of Civil Cadd's dollars and deducted them as corporate expenses or repayment of "loans" rather than listing

36

them as salary or distributions. The trial evidence is replete with conduct designed to evade detection of personal income. We are convinced that King has not shown that more preparation time would have possibly changed the outcome in this case. In the absence of "specific, substantial prejudice" to King and in light of the overwhelming evidence against King, we cannot say that the district court's denial of King's continuance motions require a new trial.

### III. Sentencing

### A. Sentencing Guidelines manual

As noted earlier, the 2006 Sentencing Guidelines manual contains the 2001 amendment to the Tax Table for computing the amount of loss for offenses involving taxation. See U.S.S.G. app. C, amend. 617, at 714-15 (2006 ed., vol. 2) (effective Nov. 1, 2001). King's complaint is that the lower Tax Table in the 1998 manual should have been used.[21] We disagree.

First, the district court properly sentenced King under the 2006 Sentencing Guidelines manual because it was in effect at the time of his January 30, 2007 sentencing. See 18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a)-(b)(1) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced. . . . If the court determines that use of the Guidelines Manual in effect

---

[21]We review the district court's application of the Sentencing Guidelines manual de novo and its findings of fact for clear error. See, e.g., United States v. Patti, 337 F.3d 1317, 1323 (11th Cir. 2003).

on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."); United States v. Aviles, 518 F.3d 1228, 1230 (11th Cir.), cert. denied, 129 S. Ct. 297 (2008) ("A defendant is sentenced using the Guidelines Manual in effect at the time of sentencing, unless this would raise ex post facto concerns, in which case the defendant is sentenced using the Guidelines Manual in effect at the time the crime was committed.").

Second, there is no ex post facto problem because King is being sentenced for a series of related crimes that went past 2001 and into 2002. See United States v. York, 428 F.3d 1325, 1337 (11th Cir. 2005) ("[I]f related crimes are committed in a series, the date of the crime at the end of the series governs the date of the Manual to be used."). King had fair notice that continuing his crimes past 2001 subjected him to the Tax Table in effect when he committed the last of the crimes for which he was convicted. See United States v. Bailey, 123 F.3d 1381, 1405 (11th Cir. 1997) ("[A] defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual."). Because the 2001 Tax Table was in effect at the time King committed the last two offenses in his series of offenses and the 2006 manual still uses that 2001 Tax Table, there are no ex post facto concerns. Thus,

38

the district court did not err in sentencing King under the 2006 Sentencing

Guidelines manual.[22]

**B.     Special verdict forms**

Even if the 2006 manual with the 2001 Tax Table applies, King proffers

three reasons the district court improperly determined the amount of loss: (1) the

jury did not return a special verdict; (2) the district court did not make a reasonable

estimate of loss based on the available facts; and (3) the district court held King

responsible for the 1998 and 2000 tax years despite not being prosecuted for 1998

and being acquitted of the year 2000 charge.  Each claim lacks merit.

First, the district court did not err in making its own finding on the amount

of loss instead of directing the jury to return a special verdict.  "[T]he sentencing

Guidelines require a district court, at the sentencing stage, to make independent

findings establishing the factual basis for its Guidelines calculations."  See United

States v. Hamaker, 455 F.3d 1316, 1338 (11th Cir. 2006).  "The district court

should . . . assess[] independently the relevant loss for sentencing purposes rather

than deferring to the jury's view of the scope of Appellants' guilt . . . ."  Id.

---

[22]King does not argue that different versions of the Sentencing Guidelines manual should be used for his three crimes.  In any event, the Sentencing Guidelines manual contains what is known as the "one book rule," which requires that a single manual govern a defendant's sentencing calculation in its entirety.  Bailey, 123 F.3d at 1404.  Moreover, the Sentencing Guidelines manual itself provides, "If the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3).  As such, the district court also did not err in applying the 2001 Tax Table in determining King's sentences for crimes committed between 1999 and 2002.

Second, the evidence at trial fully supports the district court's findings that the tax loss amount from King's offenses exceeded $400,000.[23]  For example, King's second returns for 1999 through 2002 are in evidence and alone show tax losses of $473,090.  The district court aptly stated that "just on the basis of the returns which essentially he filed himself, he has established he is in excess of the $400,000 base by $162,649."  The district court explained that it was relying on the trial evidence in finding that it was "satisfied that there is certainly sufficient evidence to satisfy the burden which is a preponderance of the evidence."  This clearly constitutes a reasonable estimate of loss based on the record.

Third, the district court did not err in including the monies owed for the non-prosecution year of 1998 and the acquitted year of 2000 in its final estimate of amount owed.  It is well established that a sentencing court may consider uncharged and acquitted conduct in determining an appropriate sentence.  Id. at 1336; United States v. Hasson, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003).

C.    **Sophisticated means enhancement**

Lastly, we turn to King's claim that the district court erred in imposing a two-level sophisticated means enhancement because there was no evidence of

---

[23]Section 2T1.1 provides that the base offense level for tax evasion will be either "(1) [the] [l]evel from § 2T4.1 (Tax Table) corresponding to the tax loss; or (2) 6, if there is no tax loss."  U.S.S.G. § 2T1.1(a).  Further, "[i]f the offense involved tax evasion or a fraudulent or false return . . . the tax loss is the total amount of loss that was the object of the offense."  Id. § 2T1.1(c)(1).  When the amount of tax loss is uncertain, "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts."  Id. § 2T1.1 cmt. n.1.

fictitious employees, offshore accounts, or sophisticated bookkeeping.

Section 2T1.1(b)(2) provides, "If the offense involved sophisticated means, increase by 2 levels." U.S.S.G. § 2T1.1(b)(2). For purposes of § 2T1.1(b)(2), "sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2T1.1 cmt. n.4. The commentary includes a non-exhaustive list of sophisticated means such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id.

We have affirmed a district court's sophisticated means enhancement where the defendant used multiple bank accounts, cash, checks, or other financial instruments to conceal income and the discovery of his tax evasion. See United States v. Campbell, 491 F.3d 1306, 1315-16 (11th Cir. 2007) (affirming sentence enhancement where tax evader "utilized campaign accounts and credit cards issued to other people to conceal cash expenditures in a deliberate attempt to impede the discovery of both the existence and extent of his tax fraud" (quotation marks omitted)); United States v. Barakat, 130 F.3d 1448, 1457 (11th Cir. 1997) (agreeing with district court's finding that defendant's practice of filtering funds through his attorney's trust account constituted a sophisticated means of concealing tax evasion); United States v. Paradies, 98 F.3d 1266, 1292 (11th Cir. 1996) (concluding district court did not err in finding tax evader's transfer of funds

41

through shell corporations in an attempt to conceal his transactions warranted sophisticated means enhancement).[24]

Here, the record amply supports the district court's findings that King: (1) used Civil Cadd's shareholder loan account to conceal income; (2) misclassified checks from vendors as loans to hide income from the IRS; (3) paid personal expenses from his corporate accounts and classified them as business expenses; and (4) had employees cash business checks and give him the money. King did not merely fail to report income, but commingled and manipulated his corporate and personal finances in order to conceal the existence, or at least large amounts, of his personal income. There was also testimony that King structured his bank account withdrawals to avoid currency transaction reports. Like the defendant in Campbell, King "conceal[ed] cash expenditures in a deliberate attempt to impede the discovery of both the existence and extent of his tax fraud." 491 F.3d at 1315 (quotation marks omitted). The fact that King did not use fictitious companies or bank accounts does not preclude him from receiving the enhancement. See id. at

---

[24]We recognize that Campbell, Barakat, and Paradies were decided under an older version of § 2T1.1(b)(2), which provided that "sophisticated concealment" means "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment." U.S.S.G. § 2T1.1 cmt. n.4 (1998). A 2001 amendment changed § 2T1.1(b)(2) from a "sophisticated concealment enhancement" to a "sophisticated means enhancement" and was designed to "allow the enhancement to apply to a somewhat greater range of tax offenses than the previously existing sophisticated concealment enhancement." U.S.S.G. app. C, amend. 617, at 712, 739 (2006 ed., vol. 2) (effective Nov. 1, 2001). As such, Campbell, Barakat, and Paradies remain helpful.

1316 (stating "[t]he fact that Campbell did not use offshore bank accounts or transactions through fictitious business entities is unavailing").  We therefore conclude the district court did not err in finding that King's tax evasion involved sophisticated means and in imposing the two-level enhancement.

## IV.  Conclusion

For the foregoing reasons, we affirm King's convictions and sentences.

**AFFIRMED**.