[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12274

_____

D.C. Docket No. 4:16-cr-10039-KMM

DAVID W. SCHWARZ,

Defendant-Appellant,

versus

UNITED STATES OF AMERICA,

Plaintiff-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 29, 2020)

Before MARTIN and NEWSOM, Circuit Judges, and WATKINS,* District Judge.

PER CURIAM:

_____

  * Honorable W. Keith Watkins, United States District Judge for the Middle District of
Alabama, sitting by designation.

David Schwarz appeals his convictions and sentences for: (1) conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, (2) two counts of bank fraud in violation of 18 U.S.C. § 1344, and (3) one count of interference with the administration of internal revenue laws in violation of 26 U.S.C. § 7212(a).

Schwarz asserts, among several other claims, that the district court abused its discretion when it repeatedly denied his motions for a continuance of the trial date, which he says caused him to suffer substantial prejudice in defending against the government's charges. Because we find merit in Schwarz's continuance argument and remand for a new trial, we do not address the remaining issues he raises on this appeal.

## I.

### A. FACTUAL BACKGROUND

David Schwarz held a one-third ownership stake in and served as the chief financial officer of Cay Clubs Resorts and Marinas from 2004 to 2007. His business partner, Fred Davis Clark, Jr., held a two-thirds ownership interest and served as the chief executive officer. Their purported goal was to develop multiple amenity-rich luxury resortsand to sell condominium units within those resorts to buyers. The business eventually employed over 1,000 people, sold over 1,100 condo units, amassed gross revenues between $700 to $800 million, and was once estimated to be worth $400 million, but it failed in 2008. Criminal investigations

2

followed.  In 2015, a jury found Clark guilty of bank fraud, making false statements in connection with federally insured loans, and obstructing an official proceeding.  Second Superseding Indictment, *United States v. Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Oct. 1, 2015), ECF No. 351; Jury Verdict, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Dec. 11, 2015), ECF No. 468.  In 2016, Clark was sentenced to 480 months in prison.  Amended Judgment, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. June 27, 2016), ECF No. 631.  On October 11, 2016, Schwarz was indicted.

## B.  THE INDICTMENT

The government charged that Schwarz and his co-conspirators orchestrated the sale of Cay Clubs condos to straw buyers to create a false appearance of business success and to pay off the business's financial obligations.The government alleged that in each set of transactions, Clark, Schwarz, and others acting at their direction prepared and caused to be prepared fraudulent loan applications and related documents that were submitted to financial institutions. The loan applications included false employment, wage, asset, and liability information for the named borrowers.  Persons acting at the direction of Dave Clark affixed false signatures and notarizations to some of the documents.  The documents also falsely represented that the cash to close such loans was provided by the borrower (as required), when in fact, Cay Clubs provided the funds.

3

Schwarz personally wired the cash to close for these transactions out of Cay Clubs accounts.The two relevant bank fraud charges rested on allegations that Schwarz personally transferred the cash to close for two units in 2006.  The government alleged that the conspirators paid the mortgage payments out of Cay Clubs accounts for at least some of the nominee loans. The alleged victims of this fraud included JP Morgan Chase Bank, N.A. and Fifth Third Bank, N.A.

Meanwhile, according to the indictment, Clark and Schwarz were funneling cash out of Cay Clubs for their personal gain.  Clark and Schwarz attempted to conceal their ill-gotten gains by, among other things, paying Clark's salary to Cristal Coleman, Clark's then-girlfriend; by failing to report income from Cay Clubs on their tax returns; and by failing to file tax returns for Clark and Cay Clubs.The government alleged that Schwarz interfered with the administration of internal revenue laws by submitting a W-2 purporting to show wages paid to Cristal Coleman to conceal wages earned by Clark.

C. THE CONTINUANCE MOTIONS

Schwarz's only attorney, a solo practitioner, was appointed on October 31, 2016.  On November 3, trial was set for December 5, 2016.  On November 4, 2016, Schwarz filed an unopposed motion for an April 2017 trial date.  The district court partially granted this request on November 9, and set trial for February 6, 2017, in Key West, Florida.  Schwarz renewed the motion on November 18, again

4

asking for an April trial date.  Schwarz represented that the government had recently produced its initial discovery, which included a three-terabyte hard drive and several boxes of records and CDs.Schwarz noted that the conspiracy and tax-related allegations in the case covered activities from 2004 to 2007 and that the discovery extended beyond 2015 and included an extensive Securities and Exchange Commission investigation.The government opposed the motion, and the court held a motion hearing on November 30.  At the hearing, the court denied the motion because it believed that defense counsel had adequate time and because of the scheduling constraints posed by a Key West trial, which required coordinating with other judges for use of a single courtroom.  During the same hearing, the court denied appointment of a second attorney because the court did not view the case as particularly complex.  Schwarz's counsel orally suggested moving the trial to Miami but did not formally move for such a transfer.  Six days later the court, *sua sponte*, moved the trial to Miami.

Schwarz filed a third motion for a continuance on January 24, 2017, again asking for an April 2017 trial date.  In the third motion, Schwarz reiterated his prior arguments and added that his counsel had been in trial for three of the preceding weeks and that he continued to receive requests for stipulations from the government that required days of rereading transcripts.  He alleged that expert and other defense witnesses who testified in Clark's trial were no longer available and

that it was difficult to seek other witnesses or pursue direct evidence in the allotted time. The government opposed the granting of a continuance longer than thirty days. The motion was denied without explanation on the same day as it was filed.

At a calendar call on February 2, four days before the scheduled beginning of the trial, defense counsel reminded the district court that it had denied past continuances, but he stated, "[W]e have the time blocked out to try this case." The court responded, "So, we're going to give you a little more time. I'm not going to give you the time that you wanted, . . . but we can now set this based on the prior court settings for . . . . February 21st." The trial began on that date.

D. THE TRIAL

At trial, the government divided its core conspiracy allegations into two sets of transactions. The government offered evidence that the conspirators engaged in seven related-party transactions in 2004—with Coleman and a Cay Clubs employee acting as buyers—to create the appearance of success of the venture and to increase the perceived value of its products. The government elicited testimony that, by providing the closing cash, Cay Clubs essentially inflated the selling price.Cay Clubs highlighted the "appreciation" on these units in marketing materials to potential buyers. The government offered evidence that the conspirators engaged in a second set of related-party sales to Coleman and to other members of Clark's family in 2006 to obtain funds for a commercial loan payment.

6

The government's trial presentation ventured far beyond the evidence needed to support its indictment.  The government argued that Cay Clubs was a massive Ponzi scheme—a fraud from its inception to its demise that engaged in deception in virtually every aspect of its business. It attempted to show that the first set of related-party sales was important to establish high appraisal values for Cay Clubs units, so that banks would approve other buyers' mortgage applications. It put forth testimony that Cay Clubs contracted to provide new furniture in some buyers' units and agreed with certain buyers to pay lease-back payments of up to fifteen percent of the purchase price.  The government attempted to show that Cay Clubs wrongfully concealed the lease-back agreements from lenders and closing agents.  The government also introduced testimony regarding Cay Clubs's broken promises to condo buyers to provide amenities and unit improvements and to make lease-back payments.

Schwarz offered several alternative theories for acquittal to the jury, generally asserting that he acted in good faith.  The defense attempted to cast Schwarz as a minority partner and office manager who was unaware of any false statements in the nominee loan applications (except as related to the cash to close) and who certainly lacked any deceptive or corrupt intent. While Schwarz admitted to making the closing payments, he thought those actions were legal.  At the time the transactions involving Coleman and involving Clark's family members took

7

place, he viewed the company money that was withdrawn to pay closing cash as Clark's money:  Schwarz booked the transactions as either equity distributions or loans to Clark and directed it to where Clark requested.  Likewise, the cash to close an employee's 2004 related-party sales was deducted from the employee's commissions.

In Schwarz's view, he honestly believed that everything he did was proper. Responsibility for any wrongdoing rested with Clark and with others involved with acquiring financing for units, selling units, and preparing the nominee loan applications.  Schwarz argued that he never intended to corruptly interfere with the administration of revenue laws because he did not know it was wrong to pay Coleman a salary at Clark's request.Schwarz also offered evidence of reliance by him and by Cay Clubs on lawyers, accountants, and auditors in support of his argument that he acted in good faith.In his opening statement, Schwarz posited that the question for the jury was "whether or not you're going to hold David Schwarz responsible for the activities of David Clark, because he did not participate in them and had nothing to do with them."

After a nine-day trial, the jury returned its verdict convicting Schwarz on four of the eight counts contained in the indictment.  It acquitted him of one count of bank fraud and of three counts of making false statements in connection with

8

federally insured loans in violation of 18 U.S.C. § 1014. After being sentenced to 480 months' imprisonment, Schwarz appealed.

## II.

We review a district court's denial of trial continuances for abuse of discretion. *United States v. Valladares*, 544 F.3d 1257, 1261 (11th Cir. 2008). "The Sixth and Fourteenth Amendments to the U.S. Constitution guarantee that any person brought to trial in any state or federal court must be afforded the right to assistance of counsel before he or she can be validly convicted and punished by imprisonment." *United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995). This guarantee includes "both a fair opportunity to be represented by counsel of his own choice and a sufficient time within which to prepare a defense." *United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir. 2005) (quoting *Gandy v. Alabama*, 569 F.2d 1318, 1321 (5th Cir. 1978)). Under certain circumstances, denial of motions for a continuance of trial may vitiate the effect of this fundamental right.

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (internal citations omitted).

9

When assessing the totality of the circumstances, this Court has considered the "time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution." *United States v. Jeri*, 869 F.3d 1247, 1257 (11th Cir. 2017) (quoting *United States v. Uptain*, 531 F.2d 1281, 1286 (5th Cir. 1976)).  To prevail on this type of claim, a "defendant must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice." *Verderame*, 51 F.3d at 251.  To show prejudice, the defendant "must identify relevant, non-cumulative evidence that would have been presented," *Valladares*, 544 F.3d at 1262 (quoting *United States v. Saget*, 991 F.2d 702, 708 (11th Cir. 1993)), and that indicates "a different outcome had the motion for a continuance been granted." *Id*. at 1264.

Under the circumstances of this case, the district court's continuance denials were a clear abuse of its discretion.  Every *Uptain* factor, except for the availability of discovery, counseled in favor of granting a continuance.  First, the available preparation time was short.  This analysis centers on what knowledge and evidence Schwarz's counsel could amass in the allotted time—access to his client's memories is not a substitute.  Schwarz's counsel was a solo practitioner.  After subtracting his time spent in other trials and the time period before the government's first disclosure of discovery materials, Schwarz's counsel effectively

10

had twelve weeks to prepare to try a complex financial case in which his client was facing decades in prison.  The government investigated and pursued the alleged Cay Clubs conspirators for at least three years before Schwarz's trial began, plus the months or years of preparation required to try Clark in a complex, six-week trial—twice.  *See* Indictment, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Nov. 26, 2013), ECF No. 3; Minute Entry, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Aug. 14, 2015), ECF No. 323 (indicating that the first Clark trial extended for twenty-eight days); Minute Entry, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Dec. 11, 2015), ECF No. 467 (indicating that the second Clark trial extended for twenty days).  Unlike Clark, who employed at least six attorneys by the end of his second trial, Schwarz was reliant on one attorney to contest three federal prosecutors armed with the IRS's resources and the SEC's extensive investigation records.  Notices of Appearance, *Clark*, No. 4:13-cr-10034-JEM-1, ECF Nos. 35, 100, 114, 163, 398, 435.[1]

---

[1]  While Schwarz is not entitled to Clark's trial process—a team of six lawyers preparing for twelve months for Clark's first trial and an additional three months for his second trial—the results are interesting.  Docket Sheet, *Clark*, No. 4:13-cr-10034-JEM-1, ECF Nos. 35, 253, 406.  Clark's first trial resulted in the acquittal of Cristal Coleman and a hung jury on his own charges, and Clark's second trial resulted in an acquittal on substantially the same conspiracy charge of which Schwarz was convicted.  Minute Entry, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Aug. 14, 2015), ECF No. 323; Second Superseding Indictment at 3–6, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Oct. 1, 2015), ECF No. 351; Jury Verdict, *Clark*, No. 4:13-cr-10034-JEM-1 (S.D. Fla. Dec. 11, 2015), ECF No. 468.

All of the foregoing facts from *United States v. Clark* are not subject to reasonable dispute because they can be accurately and readily determined from public records whose

Second, Schwarz played a limited role in shortening his own preparation time by failing to request disclosure of expert witnesses until eight days before the original trial date. The government did not file its third response to the district court's discovery order until after it received this request.

Third and fourth, the likelihood of prejudice and the degree of complexity were high. Schwarz's counsel was tasked with reviewing discovery materials spanning from 1989 to at least 2015.[2] The discovery materials included a hard drive containing three terabytes of information,[3] six CDs of bank records (comprising some or all of the records for Cay Clubs's 150 entities and related bank accounts),

---

accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *Grayson v. Warden, Comm'r, Alabama DOC*, 869 F.3d 1204, 1225 (11th Cir. 2017) ("[A] court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998)) (internal quotation marks omitted)).

[2] Early on, the government put Schwarz on notice that it was delving into some of Clark's and Schwarz's activities that began in 1989 as potential Federal Rule of Evidence 404(b) evidence.

[3] What is a terabyte? Well, it depends on the medium (print, photo, video, etc.), but at bottom it is a number of bytes of information. Three terabytes is approximately thirty with twelve zeros following, or 3 million million, or 3 trillion bytes. According to various cases, printed text gets the best bang for the buck: Three terabytes of plain text would be approximately 3,000 gigabytes (GB), or the equivalent of 1.5 trillion pages of plain (or "typewritten") text. *See Laethem Equip. Co. v. Deere & Co.*, No. 05-10113, 2008 WL 11355558, at *4 n.1 (E.D. Mich. Dec. 3, 2008) (citation omitted); *Haka v. Lincoln Cnty.*, 246 F.R.D. 577, 578 n.1 (W.D. Wis. 2007).

According to the conversion rate found in *McNulty v. Reddy Ice Holdings, Inc.*, 3 terabytes would equal approximately 660 million pages of "printed text." 271 F.R.D. 569, 570 n.1 (E.D. Mich. 2011). Without delving into the distinctions between "plain" text and "printed" text, let's just say a terabyte is more than a little information. Three terabytes would hold 3,000 copies of the Encyclopedia Britannica, or 30% of the printed collection of the Library of Congress. *United States v. Salyer*, Cr. No. S-10-0061-LKK, 2011 WL 1466887, at *1 n.2 (E.D. Cal. Apr. 18, 2011) (quotation omitted), *report and recommendation adopted*, Cr. No. S-10-061-LKK, 2011 WL 1811211 (E.D. Cal. May 12, 2011).

forty boxes available for inspection and copying at the U.S. Attorney's office, hundreds of real-estate transactions, four boxes of trial exhibitsfrom Schwarz's co-conspirators' two trials, and records from an SEC investigation that extended over several years. This discovery included 1,000 pages of Schwarz's prior testimony and at least 800,000 emails. Hidden among this trove were documents that the government specifically identified as potential *Brady* material during Clark's prosecution, but neglected to so identify for Schwarz.

The government alleged before the district court that most of the material was not relevant and that many of the documents on the drive were stored "in a way that they take up a large amount of data but do not necessarily consist of a commensurate number of pages or page-equivalents of documents." But even if we were to assume that each page of material consumed one megabyte of memory, that Schwarz's counsel only slept four hours each night, and that he reviewed documents during every waking hour for the 103 days between when the hard drive was made available on November 10, 2016 and trial, Schwarz's counsel would have needed to review over 1,400 pages per hour. If he read only the emails during that time, he would have needed to review nearly 400 emails per hour.

Of course, Schwarz's counsel could not have spent every waking hour reviewing documents. While reviewing this material, he was professionally obligated to present and respond to pre-trial motions, to draft jury instructions and

13

voir dire questions, and to seek and prepare possible defense witnesses, including experts. The government provided most of the discovery, including identifying most of its likely trial exhibits and its "hot documents" for the tax-related allegations, within a few weeks after defense counsel's appointment. However, knowledge of the government's key evidence for conviction and reassurances that most of the discovery was produced in an abundance of caution are not a substitute for defense counsel reviewing the evidence and preparing a case for acquittal. Loyalty to his client's interests required Schwarz's counsel to view the discovery with an independent eye. The Government's assessment that most of the materials were "not relevant" is meaningless: The opposing team is not privileged to call plays for the defense. Nor is the bulk of knowledge possessed by a defendant a measure of *counsel's* preparation for trial. The measure is counsel's reasonable ability to prepare. As stated in each of Schwarz's continuance motions, preparation for trial in this brief period of time was an impossible task.

We appreciate the heavy case loads and tight time constraints under which district courts operate, but we do not see compelling countervailing justifications for the district court's denials here. The district court provided little explanation of its rationale for denying the second continuance motion, and it provided no explanation for denying the third motion. From the court's comments at its hearing on the second motion, we can discern that it did not view this case as

14

complex and that it considered the limited availability of the Key West court facilities.

While the core allegations of the indictment may have appeared simple—"three substantive transactions, a conspiracy charge, and interference with the IRS," in the government's view—Schwarz's  second continuance motion informed the district court of the voluminous discovery and of the government's anticipation of a twenty-day trial.[4]  These were strong indicators of trial complexity.  If the Key West court facilities were unavailable in March and April of 2017, the district court was not bound by a binary choice; it should have looked beyond that time horizon. When Schwarz renewed his motion after the trial was moved to Miami, a venue with a greater number of courtrooms, the district court should have reconsidered its assessment of courtroom constraints.  The court may have considered the scheduling and availability of witnesses when the third continuance motion was filed two weeks before a planned February 6, 2017 trial.  However, the district court's later decision to continue the trial at the last litigation minute, four days before the early February trial date, suggests that this factor did not heavily influence its decision.  At every decision point, the risk that a continuance would

---

[4]  In the motion hearing, Schwarz's counsel stated his prescient fears that "in a conspiracy case, the [g]overnment is not going to limit itself to the three predicate actions that are put in the Indictment.  They're very likely to bring in a whole slew of other transactions in order to support the conspiracy.  I have to be prepared for this."The government did exactly as counsel predicted.

15

prejudice the government was virtually nil, while the defendant risked being unprepared for trial, resulting effectively in a life sentence. Considering the circumstances facing both the parties and the court, we find that the district court abused its discretion in a manner that virtually guaranteed Schwarz would not receive a fair trial.

The denials substantially prejudiced Schwarz's defense. In addition to the inherent prejudice suffered by a defendant whose counsel was forced to litigate under such grueling circumstances, Schwarz has supplemented the record on appeal with new documents that he argues indicate a different outcome had a continuance been granted. We agree.

The government argued at trial that Cay Clubs was a wholly fraudulent enterprise, deceiving buyers with promises of unit improvements and lease-back payments and wrongfully concealing lease-back agreements from lenders. These allegations were the vehicle through which a mass of highly prejudicial evidence entered the case. For example, the government introduced emotionally charged testimony from three buyers of Cay Clubs units, one who put her husband's life insurance payout toward her Cay Clubs loan, one who had to borrow from his retirement due to his losses, and one who declared bankruptcy and lost her primary residence. These witnesses offered some testimony relevant to the core bank fraud allegations: Each witness's purchasing decisions were influenced by Cay Clubs's

16

appreciation analysis that highlighted the first set of related-party sales. But their testimony extended far beyond these core allegations when they offered highly sympathetic descriptions of the horrid state of their units and of Cay Clubs's failure to pay lease-back payments. This testimony, and the government's opening and closing arguments that Cay Clubs was a wholly fraudulent enterprise, were highly likely to engage juror sympathies and to motivate jurors to punish Schwarz for these buyers' hardships. Undercutting these allegations could have changed the outcome.

Schwarz's motion to supplement contains several documents that undermine this grand theory and that support his "good faith" defense. Schwarz has submitted financial statements and records of unit upgrades that show that Cay Clubs spent over $52 million to improve its buildings, sites, furniture, and fixtures across fiscal years 2005 and 2006. A memorandum of interview conducted by the government with a loan officer for Fifth Third Bank and a fax cover sheet sent to that employee indicate that at least some of Cay Clubs's lenders were aware of lease-back agreements. An opinion from the law firm Greenberg Traurig advising the company regarding the impact of securities laws on Cay Clubs's lease-back agreements suggests that Cay Clubs went to great lengths to comprehend and comply with applicable laws in that aspect of its business. On the whole, these supplemental documents, combined with other evidence and testimony adduced at

17

trial, are consistent with an alternative theory that Cay Clubs was a well-intentioned but badly run business—one that could not fulfill its promises before it collapsed in the midst of a financial crisis.

This alternative theory calls into question whether Schwarz had the requisite mental states to be convicted of his crimes. To be convicted for conspiracy to commit bank fraud he must have *willfully* conspired—*i.e.*, voluntarily and purposefully acted with intent to do something the law forbids—to commit a crime that in turn requires *specifically intending* to deceive someone. *See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Offense Instruction 13.1, Basic Instruction 9.1B, Offense Instruction 52 (2020). To be convicted of interference with the administration of internal revenue laws, he must have *corruptly* interfered: He must have acted knowingly and dishonestly for a wrongful purpose. *Id.* at Offense Instruction 111.As stated in the district court's instructions to Schwarz's jury, good faith, an honestly formed belief, a mistake in judgment, an error in management, and/or carelessness cannot establish fraudulent intent. *Id.* at Special Instruction 17.

Without adequate proof of the proper mental states, the government's case becomes a prime example of how "the civil/criminal divide is frequently blurred." See Mihailis E. Diamantis, *Successor Identity*, 36 YALE J. ON REG. 1, 7 & n.24 (2019) (citing John C. Coffee, Jr., *Does "Unlawful" Mean "Criminal"?:*

*Reflections on the Disappearing Tort/Crime Distinction in American Law*, 71 B.U. L. REV. 193, 193 (1991)).  After considering the increased viability of Schwarz's "good faith" defense, the extent to which it undermines the government's highly prejudicial "Ponzi scheme" allegation, and the impossible trial-preparation challenge faced by Schwarz's counsel, we are left with substantial doubt regarding the outcome.

This Court's twenty-five-year-old admonition against the potential dangers of haste bears repeating:  "[A]n insistence upon expeditiousness in some cases renders the right to defend with counsel an empty formality.  In our system of justice, the Sixth Amendment's guarantee to assistance of counsel is paramount, insuring the fundamental human rights of life and liberty."  *Verderame*, 51 F.3d at 252.  In the particular circumstances of this case, Schwarz was denied this essential constitutional right.

## III.

Finally, the trial court's history of denying continuances in criminal cases has come to our attention.  There are seven cases from 2006 through 2017 in which the issue in this particular trial court was raised and argued on appeal, and, in all but one, there are substantive rulings by this Court.  *See Jeri*, 869 F.3d at 1257–59; *United States v. Ubieta*, 630 F. App'x 964, 970–72 (11th Cir. 2015); *United States v. Bates*, 590 F. App'x 882, 890–91 (11th Cir. 2014); *United States v. Anderson*,

329 F. App'x 878, 882–84 (11th Cir. 2009); *United States v. King*, 306 F. App'x

501, 513–18 (11th Cir. 2009); *Valladares*, 544 F.3d at 1264–65; *United States v.*

*Perez*, 473 F.3d 1147, 1150–51 (11th Cir. 2006).  We by no means challenge the

conclusions of prior panels.  The rules of the Circuit are clear, and the bar is high

for reversal when continuances are denied.  None of the listed cases resulted in

reversal, but three contained warnings to the trial court, and the most recent,

*United States v. Jeri*, found error by the trial court, but insufficient evidence of

prejudice to defendant under our precedent.

   *United States v. King* was a 2009 complicated tax fraud case involving four

years of personal and corporate tax returns of two corporations owned by

defendant which had been investigated by the Internal Revenue Service for over

three years and involved 80,000 documents in discovery.  306 F. App'x at 506.

Trial was set to begin forty days after arraignment and fifty-three days after

indictment.  Discovery was turned over by the government during the 40 days.  *Id.*

at 504.  This Court noted:  "The difficulty in trial preparation was exacerbated by

the fact that, little more than a month before trial, the government left 39 boxes

containing 80,000 discovery documents at Xpedia, a copy center."  *Id.* at 515–16.

The trial court denied several motions by defendant for a continuance, including an

unopposed motion for at least a seven-month continuance.  *Id.* at 506.  The trial

court eventually granted an eight-day continuance, after which the government

20

added twenty-five exhibits and substituted ten more, one day before the new trial date. *Id.* at 515–16. On the day of trial, defendant renewed orally his motion for a continuance, to no avail. *Id.* at 515.

Implying error, this Court made the following observations for the benefit of the trial court:

> [T]his is a complicated tax fraud case involving voluminous records. King's requests for more time to prepare was reasonable. While we understand the need to move cases expeditiously, this case was not a simple one. A 30– or 60–day continuance . . . would not have unduly delayed the court's docket under these facts.

*Id.* at 516. Nevertheless, "[t]he problem for King . . . is that he has not shown that the district court's denials resulted in 'specific, substantial prejudice' to his defense." *Id.* There was also overwhelming evidence of guilt. *Id.* at 518.

We issued another warning in our 2014 opinion in *United States v. Bates*, which dealt with a child pornography prosecution. *See generally Bates*, 590 F. App'x at 882. The denial of repeated requests for continuance was argued on appeal but not decided by the panel. *Id.* at 890. Nevertheless, this Court instructed on remand that "the District Court must assure itself that Mr. Bates has adequate resources to permit his expert to review the evidence, and enough time to pursue the evidence necessary to aid in his defense." *Id.* Noting a short period for the expert to complete a computer forensics examination, and a superseding indictment just two weeks before trial, this Court warned: "If Mr. Bates is retried on remand,

21

we hope and expect that the District Court will be mindful of his need for . . . adequate time to prepare for trial." *Id.* at 891.

As stated above, in *United States v. Jeri,* our Court found error on the part of this trial court in denying a motion for continuance when a television video of the fruits of a search in a drug case was located by the government on the day before trial, and turned over to defendant on the morning of trial.

> The facts of this case suggest to us that the trial court would have been wiser to grant a continuance or at least a short recess. After all, the video was not made available to Jeri until the morning of trial and he did not get to watch the video until after the first day of the day-and-a-half-long trial, by which time five Government witnesses had already testified.

*Jeri*, 869 F.3d at 1258. Again, however, despite "this error," defendant could not show specific, substantial prejudice, and there was no reversal. But our panel did not leave it there:

> [I]t is worth reiterating "that a scheduled trial date should never become such an overarching end that it results in the erosion of the defendant's right to a fair trial." *Id.* at 1291 [citing *United States v. Uptain,* 531 F.2d 1281 (5th Cir. 1976)]. The costs attendant to a continuance were low, but the potential risk to the defendant was real. While we are acutely aware of the district courts' heavy caseloads and fully appreciate the important public interest in their expeditious resolution, it is often wise to counsel patience in finding the "delicate balance between the defendant's right to adequate representation by counsel of his choice and the general interest in the prompt and efficient administration of justice."

*Id.* at 1258–59 (full citation added).

We are troubled, after three warnings by prior panels and in view of the particular facts of this case, that this trial court has not heeded prior panel warnings, resulting in an abuse of discretion in this case.  The risk of error is exacerbated by the setting of short trial dates.  We have considered, but rejected this time, the sanction of reassignment of this case to another court.  To avoid future sanctions, the trial court must be carefully mindful of the occasional needed continuance for a defendant and, in some cases, both sides, especially in a case as complicated as this one.

Because we conclude that the district court abused its discretion in denying Schwarz's several motions for continuance and caused him to suffer substantial prejudice in presenting his defense, we VACATE appellant SCHWARZ's convictions and REMAND for a new trial.

## IV.

**VACATED AND REMANDED.**

23